## HUNT v. GARRETT.　(No. 11108.)*

(Court of Civil Appeals of Texas.　Fort Worth.
April 4, 1925.　Rehearing Denied
June 6, 1925.)

**1. Gifts ⬅⮞28(1)—Delivery of key to tin box containing choses in action constituted sufficient delivery of box and its contents as gift.**

Delivery of key to tin box containing choses in action, and constructed for the purpose of excluding from its contents all persons save the one in possession of the key, constitutes sufficient delivery of box and its contents, where made with intent to give donee absolute ownership and right of possession.

**2. Gifts ⬅⮞22—Delivery of gift of choses in action or other personalty may be constructive.**

Delivery of gift of choses in action or other personalty may be constructive.

**3. Gifts ⬅⮞47(1)—Alleged donee of deceased had burden of proof to establish claimed gift of tin box containing personalty.**

Defendant, who, after deceased's death, asserted that deceased had made a gift to him of a tin box and of the contents therein, had the burden of proving such fact in executor's suit to recover such property.

**4. Gifts ⬅⮞49(1)—Preponderance of clear, explicit, and convincing evidence is necessary to establish gift inter vivos.**

Generally, to establish a gift inter vivos there must be a preponderance of clear, explicit, and convincing evidence in support of every element needed to constitute a valid gift, especially where the gift is not asserted until after the donor's death.

**5. Jury ⬅⮞9—Right of trial by jury is constitutional and legislative guaranty.**

The right of trial by jury is guaranteed by Constitution and laws.

**6. Trial ⬅⮞139(1)—When evidence authorizes court to take question from jury stated.**

To authorize a trial court to take the question in issue from the jury, the evidence must be of such character as to leave no room for ordinary minds to differ as to the conclusion to be drawn from the evidence.

**7. Gifts ⬅⮞50—Whether deceased delivered to defendant key to tin box as gift or in trust or for delivery to others held for jury.**

Whether deceased, before a fatal surgical operation, delivered as a gift to defendant a key to a tin box containing choses in action, or whether he delivered it to him in trust or for delivery to others, held for jury, and in taking the case away from the jury, and giving a peremptory instruction on the question, the court erred.

**8. Trial ⬅⮞143—Conflict in testimony held for jury.**

In suit by administrator to recover property claimed by defendant as gift from decedent, conflict in the testimony as to whether deceased was upon affectionate terms with relatives in foreign state held for jury.

**9. Evidence ⬅⮞106(1)—Evidence of good character of party is competent when charge against him amounts to fraud or a crime.**

Evidence of good character of party is competent when misconduct charged against him amounts to fraud or a crime.

**10. Trial ⬅⮞139(1)—Weight to be given to character of alleged donee held for jury.**

In executor's suit to recover property which defendant asserted was given to him by deceased before the latter submitted to a fatal surgical operation, the weight to be given to the fact of defendant's good character held for jury, in view of statute making it the exclusive judges of the credibility of witnesses and the weight to be given their testimony.

**11. Appeal and error ⬅⮞1058(1)—Rejection of evidence, substance of which was otherwise admitted and before jury, held not reversible error.**

Rejection of evidence, substance of which was otherwise admitted and before jury, held not reversible error.

**12. Witnesses ⬅⮞159(7)—Proffered testimony as to transaction with deceased person held inadmissible under statute.**

Proffered testimony of one asserting to be a donee of deceased that on a certain morning when deceased was in room at sanitarium, before going to the operating room, he took from his pocket a key to a tin box containing securities, and handed it to defendant with remark, "I want you to have everything that is in that box; it is yours," and that defendant accepted it, held inadmissible under Rev. St. art. 3690.

**13. Witnesses ⬅⮞175(1)—Testimony given in behalf of adverse party held not waiver of his right to object to proffered testimony as to transaction with deceased person.**

In suit by executor to recover personalty, which defendant claimed was given to him by deceased in a sanitarium before he, deceased, submitted to a surgical operation, testimony of plaintiff's witnesses, who were not interested in the estate as to what occurred in the office of the sanitarium, held not waiver, under Rev. St. art. 3690, of executor's right to object to proffered testimony of defendant that deceased, while preparing for the operation, handed defendant a key to a tin box, and delivered box to defendant as a gift.

**14. Appeal and error ⬅⮞747(1)—Rule 101, allowing appellee to assign cross-errors, held confined to subject-matter, and relevant to questions involved in appeal prosecuted.**

Rule 101, allowing appellee to assign cross-errors, held confined to subject-matter, and relevant to questions involved in the appeal actually prosecuted.

**15. Appeal and error ⬅⮞747(1)—Appellee's cross-assignments of error not entitled to consideration under rule 101.**

Appellee's cross-assignments of error as to court's peremptory instruction as to one of the two causes of action asserted held not en-

---

⬅⮞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted November 4, 1925.

titled to consideration under rule 101, where appellee at the time did not except to the charge given or file a motion for new trial complaining of such action, nor give notice of appeal from the judgment against him rendered on such cause of action in accordance with the peremptory instruction.

**16. Appeal and error ☞21—Counsel cannot give Court of Civil Appeals jurisdiction by mere agreements.**

Counsel cannot give Court of Civil Appeals jurisdiction by mere agreements.

**17. Appeal and error ☞396—Cases not brought within power of revision of Court of Civil Appeals by notice of appeal and other requirements cannot be considered.**

The jurisdiction of the Court of Civil Appeals being defined by the written law, cases not brought within its power of revision by notice of appeal and other requirements cannot be considered.

*On Motion for Rehearing.*

**18. Trial ☞139(1) — Issue cannot be taken from jury, where there is some evidence tending to support affirmative thereof.**

Where there is some evidence tending to support the affirmative of the issue, it cannot be taken from the jury.

**19. Trial ☞139(1)—Weight and effect of evidence is for jury when it has probative force in support of or against material issue.**

Weight and effect of evidence is for jury when it has probative force in support of or against material issue, whether arising in law or in equity.

**20. Witnesses ☞181—Objection under statute forbidding testimony of interested witness with reference to transaction with deceased person may be waived.**

Objection that testimony of an interested witness, pertaining to a transaction with a deceased person, is forbidden by Rev. St. art. 3690, may be waived.

**21. Appeal and error ☞747(2)—Testimony as to transaction with deceased person, objection to which on ground other than want of probative force is waived, held entitled to consideration.**

Where appellee by not assigning cross-error waived objections that testimony of interested witness as to transactions with deceased was forbidden by Rev. St. art. 3690, such testimony was not without probative force in passing on error assigned to direction of verdict.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Suit by Rufus S. Garrett, as administrator of the Estate of G. W. Hunt, deceased, on two causes of action against W. W. Hunt. From a judgment for plaintiff on the first cause of action and for defendant on the other, defendant appeals; plaintiff assigning cross-errors. Judgment on first cause of action reversed, and cause remanded for new trial, and judgment on second cause of action affirmed.

Ocie Speer, of Fort Worth, for appellant.

Flournoy & Smith and W. W. Blume, all of Fort Worth, for appellee.

CONNER, C. J. Rufus S. Garrett, administrator of the estate of G. W. Hunt, deceased, instituted this suit against W. W. Hunt in the district court of Tarrant county to recover the possession of certain securities and written evidences of debt, specified in his petition, of the alleged value of $30,000.

The petition alleged that as administrator he was entitled to the possession and control of the securities and obligations described, and that the defendant had no right or interest therein whatsoever except as a legatee under the will of said G. W. Hunt, deceased, to the extent of $1,000, which was subject to the right and control of the plaintiff. The plaintiff alleged—

"that upon the death of said G. W. Hunt, defendant. W. W. Hunt, wrongfully seized and took possession of all and singular the said personal property, fraudulently claiming the same and the title and possession thereof, as against the legal representative of the estate of said G. W. Hunt, deceased, and his devisees, and is attempting to appropriate and convert the same to his own use in fraud of the rights of those legally entitled to same as aforesaid; that at the time of his death as aforesaid the said G. W. Hunt was the owner and in possession of a certain other promissory note for the principal sum of $3,000, dated, to wit, on or about September 1, 1922, signed by defendant, W. W. Hunt, and payable to said G. W. Hunt on demand, bearing interest from date at the rate of 8 per cent. per annum, and secured by certain shares of the capital stock and certificate therefor attached of Fort Worth Seed Cmpany, a corporation domiciled in said county of Tarrant, the said stock being of a value equal to the obligation of said promissory note with interest accrued and to accrue thereon; that on the death of said G. W. Hunt defendant, W. W Hunt, wrongfully and fraudulently obtained possession of said note and evidence of his said indebtedness and the said security therefor, and wrongfully and fraudulently destroyed the said note and evidence of indebtedness, and now denies the obligation of same and any indebtedness thereon."

The defendant answered by demurrers, the general denial, and specially denied the plaintiff's allegations of fraud and conversion of the securities, and at some length pleaded that the deceased was a brother of defendant, old and infirm, and dependent upon others; that the relation between the deceased and the defendant was at all times the kindest, and that for many years prior to the death of deceased he had made his home with defendant and his family, and that the relations were at all times most pleasant, satisfactory, and tender, and that

such condition remained up until his death, which came as a result of a serious surgical operation; that prior to said operation the deceased, being fully cognizant of the seriousness of the proposed operation, and being fully conscious that such operation might or might not be fatal, and being in full possession of his faculties, then and there said to the defendant in effect and substance that he, the defendant, had given him a home when other relatives had refused, and that he, the defendant and his family, had been good to him during his stay in their home, and that he, the deceased, wanted him, the defendant, to have all the papers and property, being notes, mortgages, stocks, and other securities and papers then owned by the deceased, and then in a certain safety box in the safe-keeping of J. N. Winters Realty Company, in Fort Worth, to which box the deceased then had the key; that the deceased then and there said unto this defendant in words in substance and effect that everything in that box "is now yours," and then and there delivered to defendant the key to said box, which was then and there locked, and in the possession of the person or persons above stated, and defendant then and there accepted said gift, and did then and there and from henceforth have possession of the same and claimed the same as his own, as was his right, and since said time no other person has at any time had the control or possession of said box except by the consent or under the direction of defendant.

The defendant further pleaded, in substance, in answer to the allegations of plaintiff seeking a recovery upon a $3,000 note, that on or about September 1, 1922, the defendant had made and delivered to the deceased a promissory note for $2,250 bearing interest at the rate of 8 per cent. per annum, payable on demand, but that the same had been later canceled and destroyed by G. W. Hunt before his death and the stock for which the note was made given to defendant.

The trial was before a jury, but upon the conclusion of the evidence the court gave the following instructions:

"Gentlemen of the jury, With reference to the issue made in this case of the ownership of the contents and the property represented by the contents of the box, as set out in plaintiff's petition, you are instructed that you will find a verdict for the plaintiff.

"As to the issue tendered by the plaintiff as to the liability of the defendant to the estate of G. W. Hunt, deceased, upon a promissory note or notes executed by the defendant, W. W Hunt, you are instructed to return a verdict for the defendant; said issue being tendered by the plaintiff's petition in paragraph 8 thereof."

The verdict of the jury and the judgment of the court was in accordance with the instructions so given.

The defendant seasonably filed a motion for a rehearing, in which he complained of the court's peremptory instruction to find a verdict against the defendant and in favor of the plaintiff for the recovery of the instruments, securities, and properties sued for by the plaintiff. The motion was overruled, and defendant has duly prosecuted this appeal, assigning error as indicated in his motion for rehearing.

We will first consider appellant's assignment complaining of the peremptory instruction. The plaintiff below offered proof of the probate of the will of G. W. Hunt and of plaintiff's appointment as administrator of the estate, with the will annexed.

H. H. Wilkinson testified in behalf of plaintiff below, in substance and so far as pertinent to the question under consideration, that in the summer of 1923 Judge Speer, counsel for defendant, and Mr. Flournoy, counsel for plaintiff, came to the Continental National Bank, of which the witness was vice president, with a box that was represented at the time to contain certain securities and evidences of debt, and made an arrangement with the bank to hold the box pending this litigation. The witness described the box as being about 6 inches wide, 12 inches long, and 6 or 7 inches deep. The box was locked when it was left in the bank, and the key was not delivered to him; that the box was merely left with the bank for safe-keeping, by mutual consent of the parties, and with the understanding that all of them must be present when it was taken down; that about 60 or 90 days before the date of the trial the plaintiff, Judge Speer, and Mr. Winters came to the bank, and wanted to get into the box in order that Mr. Winters could pay a note that was in the box in favor of G. W. Hunt; that Mr. Winters paid the note, and the currency given in payment was then placed in the box.

Mr. Balfour testified in behalf of plaintiff that he was the internal auditor of the Tarrant County Building & Loan Association; that his attention had been directed to an interest which at one time stood in the name of G. W. Hunt; that the amount of his holding in that association at the time of his death on April 14, 1923, was $20,133.33. Since that time there have been two other dividends credited to his account, one on June 30, 1923, amounting to $1,006.67, and one on December 31, 1923, amounting to $1,057; his total credit at the time of witness' testimony being $22,197. That so far as the books of the association show G. W. Hunt is still the owner of that deposit. That it still stands in his name.

J. N. Winters testified in behalf of plaintiff that at one time he had in his custody and office a tin or metal box about 12 inches long, 6 inches wide, and 4 or 5 inches deep, which was left there by G. W. Hunt, now deceased; that G. W. Hunt brought the box

to him, he thought, in December, 1922, but was not positive as to the date; that it might have been as late as the middle of January, 1923; that W. W. Hunt, the defendant, was the brother of G. W. Hunt; that he had no arrangement with G. W. Hunt about keeping the box, except he gave him permission to keep the box there; that it was in G. W. Hunt's custody rather than that of the witness; that G. W. Hunt carried the key to the box, the witness had no key to it; that, some time before the death of G. W. Hunt, W. W. Hunt came to the office of witness and got the box and took it out, saying that his brother had asked him to come and get the box; he took the box out with him, and afterwards brought it back and put it in the usual place.

Nell Wadsworth testified in behalf of plaintiff that she had charge of the safety deposit box department in the Continental National Bank, and was in that position in June and July, 1922; that she knew G. W. Hunt in his lifetime, became acquainted with him in May, 1922, when he came to the witness' department with some papers; that she did not at that time know what they were, because she did not look at them, but he left them with her, and she put them away for him; that a few weeks afterwards he brought some more papers there, and left some notes, "he said they were important, and that we would make a list of what he was leaving with me"; that she fixed a little book, and entered these notes in the book to show what he had there; she gave the list to Mr. Hunt, and then put the notes with the papers he brought the first time; that about the 1st of July, 1922, G. W. Hunt left with her a note for $1,500, signed by his brother, W. W. Hunt; the note had 15 shares of Fort Worth Seed Company stock attached to it; that she questioned Mr. Hunt about the shares of stock at the time, and he told her they were worth $100 a share; that she did not remember the date of that note, but said it was signed by W. W. Hunt, and was payable to G. W. Hunt; that later, about the 1st of September, 1922, G. W. Hunt brought to the witness another note signed by his brother, W. W. Hunt; that this was shortly before he went away, which was about the 1st of September; that this second note was for $1,500, just like the first one; that she did not remember whether the second note had collateral attached to it; that when G. W. Hunt left here (Fort Worth) about the 1st of September, he told her he was going back to Tennessee; that in December, 1922, he came back to Fort Worth; that when G. W. Hunt left here in September he took the papers and securities he had left with her away with him, and that she did not hear any more of him until he came back in December, 1922; that when he came back to the bank in December, 1922, she did not list his papers for him as she had done before, but he told her he was returning the same papers that she had kept for him before he made this trip;

that she did not look the papers over, nor did she look to see if the two notes signed by W. W. Hunt were with the papers at that time; that he said he was bringing back the "same papers" that he had left before for safe-keeping; that along in the first days of January, 1923, G. W. Hunt took all of his papers away from the bank, and did not bring them back any more; that during the time she kept the papers for him they were never in any box or receptacle of any kind; that they were simply locked in a safety deposit box until a list of them had been made, but which was never done.

On cross-examination the witness testified that the time when she made a list of the papers delivered to her by G. W. Hunt was in June, 1922; that she gave the list to G. W. Hunt; that at that time neither of the W. W. Hunt notes had been left with her by G. W. Hunt; that later, when the W. W. Hunt notes were brought in, she listed them by merely adding the papers brought to the list theretofore made; that neither of the W. W. Hunt notes was for $1,250; that it was not a fact that one of the W. W. Hunt notes was for $1,000 and the other for $1,500; that she had never had occasion to look at the W. W. Hunt notes except at the time G. W. Hunt handed them to her; that when the second of the W. W. Hunt notes was brought to the witness she made some remark to G. W. Hunt about his brother, and that G. W. Hunt remarked that his brother was in hard shape financially, and had come to him for some more money or for some more help, and that was just a short time before he went away on his trip; that G. W. Hunt said that "his brother was in hard shape, financially, and that he was helping him. G. W. Hunt was a bachelor and a man of some means."

Mr. Walker H. Gill testified in behalf of plaintiff, and said that he resided in Nashville, Tenn.; was connected with the Nashville Trust Company in the capacity of trust officer, and was connected with that company in the same capacity in April and May, 1923; that he came to Fort Worth on May 4, 1923; that during the course of his stay in Fort Worth he had occasion to be present at an interview in the office of Judge Speer, counsel for defendant, with respect to the box that the witnesses had testified about and the contents of that box; that at that meeting there were present Mr. Speer, Mr. W. W. Hunt, Mr. Flournoy, and witness himself, and at that time there was produced a tin box, which was the box that was afterwards deposited in the Continental National Bank; that the box was opened at that time in the presence of Mr. Speer and Mr. Hunt, and a list of the contents of the box was made, after which, by agreement of all parties, the box was returned to the bank for safe-keeping without prejudice to anybody, until the controversy could be settled by litigation.

On cross-examination the witness testified

that the meeting referred to by him was at his request or at the request of Mr. Flournoy, which was willingly and cheerfully acceded to by Judge Speer and Mr. Hunt; that he did not recall whether the box was locked or not, but, if it was locked, it was opened by Mr. Speer or Mr. Hunt; that either Mr. Speer or Mr. Hunt opened the box, but whether they unlocked it with a key at that time he did not remember; that this suit had not been filed at the time of the examination of the box and its contents, and the information was desired for the purpose of this suit; that "we had not determined at that time to bring the suit, and we wanted to find out what was in the box"; and that it was "admitted that W. W. Hunt, the defendant, now owns $3,000 stock in the Fort Worth Seed Company, but this admission does not carry with it an admission that that stock was bought with money that G. W. Hunt had loaned him."

H. H. Hardin testified in behalf of defendant that he had lived in Texas a little over 50 years and in Tarrant county over 14 years; that he was in the retail lumber business, and had a chain of lumber stores; that he has known W. W. Hunt 13 of 14 years; that he knew his general reputation in Fort Worth and in this vicinity where they both lived, for honesty and fair dealing; and that that reputation was good.

M. A. Clark testified in behalf of defendant that he had lived in Fort Worth since 1881; was in the lumber business; and had been since 1883; that he had known W. W. Hunt for 15 or 20 years; that his reputation in Fort Worth and vicinity, where he lives and has lived, for honesty and fair dealing was good; that the witness never heard his reputation questioned.

On cross-examination he testified that the defendant, W. W. Hunt, used to work in the lumber business, he thought it was with the Texas Lumber Company; that he did not owe the Wilson Lumber Company, or the company of witness, anything.

J. W. Draughon testified in behalf of defendant that he had lived in Fort Worth about 25 years; that he had been engaged in the educational and business college work up to a few years ago, but was now in real estate business; that he knew W. W. Hunt and his brother, G. W. Hunt; that during the lifetime of G. W. Hunt he heard him mention his brother W. W. Hunt, the first time was shortly after he came to Fort Worth, about 2½ or 3 years ago; that, he being a Tennessean and the witness being one, he visited him, and at that time deceased mentioned the fact that he was here visiting his brother, and that he was enjoying himself very much; that after that time the witness was more or less associated with him in a social way, and often heard him speak of W. W. Hunt and his wife, and how nicely they treated him; that for several years the witness saw him often, and he would always mention his enjoyment

here; that whenever G. W. Hunt spoke to the witness of his brother, his expressions were always kindly; that he lived here with his brother, off and on, for a period of about 2½ years, and in talking to the witness frequently referred to the excellent treatment he received at the hands of W. W. Hunt and his wife, and especially mentioned Mrs. Hunt's kindness to him; that two or three times G. W Hunt spoke to the witness about helping his brother financially; that on one occasion he remembered that G. W. Hunt had been thinking about buying a certain piece of real estate that faced W. W. Hunt's home, which the witness had sold, and upon which parties were endeavoring to negotiate a loan of $3,000. G. W. Hunt remarked to witness that he had been thinking about buying that piece of property for his brother, W. W. Hunt, and they were trying to locate the owners. Another conversation occurred with reference to some stock in the Fort Worth Seed Company. W. W. Hunt mentioned something about buying some stock in that concern, and G. W. Hunt said that his cash was not available just at that time, and they asked financial assistance of witness in the matter, and later they arranged for a loan of $1,500. Both G. W. Hunt and his brother, W. W Hunt, signed the note, and witness indorsed it as surety. "That was a 30-day note to the F. & M. National Bank until Mr. Hunt's money could get here from Tennessee. I understand that note was paid off as soon as Mr. Hunt's money got here from Tennessee. I know W. W. Hunt's general reputation in Fort Worth and vicinity for honesty and fair dealing in business. I think that reputation has been good. I have never heard it questioned by anybody."

Cross-examined, he said:

"The note transaction occurred several months after the organization of the Fort Worth Seed Company and some eight or ten months prior to the death of G. W. Hunt. I will say that it occurred along in the spring or summer of 1922. G. W. Hunt told me that he gave his brother $1,500 stock in the Fort Worth Seed Company, and that was the money they got from the F. & M. National Bank to buy the stock with."

A. J. Ball testified in behalf of the defendant that he had lived in Tarrant county for the last 16 years, and known the defendant about 4½ years; that he lived just across the road from W. W. Hunt; that he also knew G. W. Hunt; that he lived with his brother, W. W. Hunt, something like 3 years; that after G. W. Hunt began living with his brother W. W. Hunt built an additional room onto his house for G. W. Hunt, who thereafter occupied it; that he talked with G. W. Hunt a number of times. One of his conversations was the week before G. W. Hunt died. He told witness he was going back to Tennessee on Tuesday. He made the remark that he was not able to go; that he had to

go; that he had some papers there that he wanted to change. He said Will and his wife had been awfully good to him. G. W. Hunt and W. W. Hunt and his wife were good friends. He went with them in the car whenever they went anywhere. Witness would always see the old gentleman with them when they went anywhere. Witness knew the general reputation of W. W. Hunt in the community where he has lived during the time witness had known him for honesty and fair dealing in business and square business methods, and that reputation was 100 per cent.—what witness called No. 1; that it was good, and he had never heard it questioned; that he had never heard G. W. Hunt state his age, but would judge him to have been close to 80 years old.

Mrs. Dudley C. Shoemaker testified that she had lived across the street from W. W. Hunt for some 11 years, and knew him and family well during that time; that she knew G. W. Hunt during his lifetime; that he was at witness' house many times; that the old gentleman made his home with Mrs. W. W. Hunt; that G. W. Hunt always spoke in the highest terms of his brother, W. W. Hunt, and his wife; she never heard any expression of disagreement or discontent from him; that she had known W. W Hunt during the 11 years that she had lived near him; that his reputation for honesty and fair dealing during that time had been the very "highest a man can attain"; that she never heard any one question him; that about the time his brother came there to live W. W. Hunt built an extra room, and put in hot water connections and a bath for the old gentleman's benefit, who always occupied that room until the last day he was there.

W. C. Shoemaker, the husband of the witness whose testimony has just been given, testified, among other things, that he knew both W. W. Hunt and G. W. Hunt, and that shortly prior to the death of G. W. Hunt he had a conversation with him, in which G. W. Hunt told the witness that he was going back to Tennessee to change some papers; that he had known W. W. Hunt during the 11 years he had lived near him, and during that time his reputation in that neighborhood and Fort Worth for honesty and fair dealing had been "mighty good"; that he had never heard it questioned by anybody.

Dr. Lily Roberts testified in behalf of defendant that she was connected with Braswell's Sanitarium; that she remembered G. W. Hunt, who was operated on there; that W. W. Hunt, his brother, brought him to the sanitarium; that Mrs. Hunt was also with them; that G. W. Hunt was very old, she thought about 80 years; that G. W. Hunt was brought to the sanitarium early on the morning of the 11th day of April, 1923; that he was weak and suffering, but getting along fairly well; that he was well preserved for an old man; that his mental condition

seemed to be clear; that he talked normally; that he was operated on the next day about 9 a. m.; W. W. Hunt and Mrs. Hunt were in the room when the patient took his room, and that a nurse was in there; that Dr. Braswell operated on Mr. Hunt; that she had known W. W. Hunt for about 10 years; that his general reputation for honesty and square, straight business dealing since she had known him had been clean so far as she knew, "I never heard it questioned in any way in the world"; that G. W. Hunt came to the sanitarium on the 11th, was operated on the 12th, and died on the 14th of April.

E. C. Payant testified in behalf of the defendant that she was a nurse at Braswell's Sanitarium; that she remembered the old gentleman, G. W Hunt; that she was not in G. W. Hunt's room just at the time it was assigned to him, but was afterward in and out of his room; that his brother, W. W. Hunt, was in the room with him; that she had known W. W. Hunt something like 10 or 12 years, and had never heard anything to the contrary than that his general reputation for honesty and fair dealing was good.

Sam Steele testified in behalf of the defendant that he had known W. W. Hunt about 3 years; that the witness is in the grocery and meat business; that he knew the general reputation of W. W. Hunt during the time he had known him in Fort Worth and vicinity for honesty and fair dealing, and that it was good as far as the witness knew; that he had never heard it questioned.

John Phillips testified in behalf of defendant that he lived in Fort Worth, and had for 20 years; that he was in the furniture business, and had known W. W. Hunt 10 years; that he had found Mr. Hunt to be "an A-1 man in every way"; that he never heard his reputation for honesty and fair dealing questioned by any one.

H. H. Wilkinson, being recalled by counsel for the plaintiff, testified in his behalf that he had with him a tin box about which he had testified on the day before, and, after stating the contents of the box, further stated on cross-examination that it did not contain any notes signed by W. W. Hunt and payable to the order of G. W. Hunt; that the contents of the box were in the same condition that they were when the box was delivered to the witness so far as he knew, with the exception of the substitution of the money paid by J. N. Winters upon his notes.

J. E. Bohrer testified in behalf of the defendant that he had known W. W. Hunt about 15 years, and also knew his older brother, G. W. Hunt; that he once had occasion to sign two notes made by W. W. Hunt to his brother, G. W. Hunt, the first was about June 1, 1922, for $1,000; "that note was signed by W. W. Hunt and myself and payable to G. W. Hunt"; that he did not remember its new date; that another note of

the same character he believed was about October 26, 1922, for $1,250; that note was also signed by W. W. Hunt and the witness, and payable to G. W. Hunt; that the two notes mentioned were the only notes from W. W. Hunt to G. W. Hunt that he knew anything about; that he had been associated with W. W. Hunt in a business way, and that as far as his general reputation for honesty during the time the witness had known him was concerned, "it has been strictly honest as far as I know, I have never heard it questioned."

Cross-examined, he said, among other things, that he was never a party to any paper with W. W. Hunt or G. W. Hunt except the two notes described; that he knew nothing about how the notes were paid; that the witness did not pay them; that the notes he had been testifying about had been secured by $2,000 worth of stock in the Fort Worth Seed Company; that both witness and W. W. Hunt owned stock; that he did not know how much of his stock W. W. Hunt put up to secure the notes; that the money received from these two notes was put into the business of the Fort Worth Seed Company, used to buy stock in that company; that witness got part of the stock and W. W. Hunt part of it; that witness got half of $2,250 worth of stock and W. W. Hunt got the other half; that witness did not pay $1 of the notes, but gave W. W Hunt his note for $1,000, which had not yet been paid; that witness was president of the Fort Worth Seed Company, and W. W. Hunt owns $3,000 of stock in that company.

Ben H. Martin testified in behalf of the defendant that he was in the banking business with the F. & M. National Bank of Fort Worth, and had been with that bank about 30 years, and was its vice president; that he had known W. W. Hunt 6 or 8 or 10 years or longer; and that during that time his general reputation for honesty and fair dealing in this community has been good so far as the witness knew.

L. P. Card testified that he had lived in Tarrant county 19 years, and was at present vice president of the Exchange State Bank, and, at the time of testifying, foreman of the grand jury; that he had known W. W. Hunt since 1916, and also knew his brother, G. W. Hunt; that at one time he had a conversation with G. W. Hunt with reference to his brother, W. W. Hunt; that G. W. Hunt was an old man with plenty of time to kill and would frequently come into the witness' office and talk to him; that the usual line of his conversation was about himself and his brother, W. W Hunt; that he always spoke very highly of his brother, and that he was living with him, "in fact I think he said he was the only one of his folks that he could live with and get along with them"; that character of conversation occurred several times; that he never heard him speak unkindly of his brother, W. W. Hunt; that W.

W. Hunt has been doing business with the Exchange State Bank since 1916, and "I sure know his reputation in this community for honesty and fair dealing—that reputation is good."

Mrs. W. W. Hunt testified in behalf of the defendant, stating her name, the length of time she had been married to W. W Hunt, and that they had lived in Tarrant county about 17 years. Further testified that she knew her husband's brother, G. W. Hunt; that he had lived at the house of witness and her husband from about the first of 1921 until he died in 1923; that G. W. Hunt went to the hospital on the 11th of April and died on the 14th; that her husband came into actual possession of the key to the tin box that had been introduced in evidence about 10 o'clock on the 11th of April, 1923; that she was with him at the hospital at the time; that only her husband and his brother and the witness were present at the time the defendant came into possession of the key; and that the witness did not give it to him herself.

Cross-examined by counsel for plaintiff, she stated, among other things, that—

"There was nobody present except G. W. Hunt and my husband and myself at the time my husband came into possession of the key of this box. I have stated the time when my husband came into possession of the key. He came into possession of the key at Braswell's Sanitarium in the front room downstairs."

W. W. Hunt was called as a witness in his own behalf, and, among other things not necessary to repeat, was permitted to testify that his brother died on April 14, 1923; that he had heard the testimony of Miss Wadsworth in which she recalled that there were two notes of $1,500 executed by W. W. Hunt to G. W Hunt, but that he did not execute any such notes at any time; that he first saw the tin box that had been introduced in evidence during the Christmas period of 1922; that he had bought the box and gave it to his brother for a Christmas present; that his brother kept the box in Mr. Winters' realty company vault the latter part of his life; that it was a lock box; that it had a lock and key to it when he presented it to his brother; that he turned the key over to him with the box; that he, the witness, now had the key to the box with him; that he had produced the box at the conference between Judge Flournoy and Mr. Gill and Judge Speer the summer before the trial; that it had been produced at the request of the parties named; that the witness opened the box, and that no one else had the key thereto; that the purpose of opening the box was to list the securities therein as had been testified to by Mr. Gill; that he came into possession of the key to the box on Wednesday morning, April 11, 1923, about 9 or 10 o'clock, and that no one else has had pos-

session of the key since that time; that at the time he received the key the box was in Mr. Winters' office; that he was not in Mr. Winters' office or down town anywhere when he received the key.

On cross-examination by Mr. Flournoy, he testified that he did not execute two $1,500 notes to his brother, but did execute two notes, one for $1,000, and one for $1,250. Re-examined by Judge Speer, witness stated that the two notes mentioned that he had made to his brother were not in the box or in existence at the time of his brother's death.

Dr. R. O. Braswell, called as a witness in behalf of the plaintiff, testified that he was the proprietor of the Braswell Sanitarium, and was in April, 1923. That G. W. Hunt was brought there on the morning of April 11, 1923. That he did not see the parties when they went to the sanitarium, and, when he came down stairs and went to the front, there were present in the party G. W. Hunt, his brother, W. W. Hunt, and Mrs. W. W. Hunt. At that time they were in the office. That the office room was about 12 feet wide, and probably about 18 or 20 feet long. That when the witness came into the office he saw that Geo. W. Hunt had piled out on the desk "some valuables, a bank-book and some other things, I don't know how much, but among other things a magnificent watch. * * * As to the things he laid on the desk, I did not go on the inside of the inclosure, and I am not sure I saw Dr. Roberts take them. * * * Dr. Roberts did take the property of patients and put it in the safe when they entered the sanitarium, and she would return them to the patients when they went out—that was the routine of that part of the business. When people came into the sanitarium, as a rule we requested them, if they didn't do it otherwise, to place them in a package, and we would put them in the safe for safe-keeping for them. I paid no attention to the pile of things that G. W. Hunt had put on the desk, except his watch. I waited out in front until they had gotten through with their transaction of putting the stuff in the safe and G. W. Hunt had finished his talk with W. W. Hunt—they were talking and W. W. Hunt was writing something. Dr. Roberts was there in the office during all of that time. After those things were done, Geo. W. Hunt was assigned to his room, and I went to the room with him." That he did not think either W. W. Hunt or his wife were in that room with Geo. W. Hunt at the time.

Cross-examined by Judge Speer, he said, among other things, that he did not hear Geo. W. Hunt say anything about sending his watch to his nephew back in Tennessee; that Geo. W. Hunt was rational and at himself mentally when he came into the sanitarium; that he had known W. W. Hunt 16 or 17 years; that he had operated on him about 14 years ago, and thought he knew his general reputation for honesty and fair dealing in this community; that it was good; that that he never heard it questioned.

Dr. Lily Roberts, being recalled and further examined by Mr. Flournoy, testified, among other things, that in April, 1923, she was connected with the Braswell Sanitarium, and among other things it was her duty to receive valuables for in-coming patients and return them when they left the sanitarium, and she was in the office when Geo. W. Hunt came there on April 11, 1923; that with him at the time was W. W. Hunt and his wife, all of them came into the office; that she was at the desk when they came there, and G. W. Hunt and W. W. Hunt came and stood at the end and side of the desk close together; that Geo. W. Hunt gave her some things to put in the safe, but she did not know just what he put in the package; that she never looked to see what it contained; that he took some things out of his pockets and put them in the envelope; that she did not look to see whether he put any keys in the envelope; that she made no list of the things; that he could have put keys in there without the witness knowing it; that when he had put the things in the envelope he turned it over to the witness, and she put it in the safe. "I did not deliver that envelope to any one after the death of G. W. Hunt. If that was done, possibly the superintendent of the hospital will know about it. I do not know. We now keep a record of such deliveries, but did not at that time."

Mr. J. N. Winters, being recalled in behalf of defendant, testified that he could not state definitely the date when he surrendered possession of the tin box that G. W. Hunt left with him, but thought it was the day of his death that he delivered the box to W. W. Hunt.

Mr. Clingman testified in behalf of the plaintiff that he was the secretary-treasurer and was manager of the Tarrant County Building & Loan Association, and that in December, 1922, he had a conversation with G. W. Hunt in reference to some investments in which he sought to know whether his association could accept the trust—that he wanted to leave his funds in that way for his nieces and nephews.

Miss Nell Wadsworth was recalled; testified in behalf of defendant that, when G. W. Hunt brought into her department the first one of the notes signed by his brother about June, 1922, she remarked to him, with reference to why he did have his brother put up dollar for dollar collateral on the note, and said, "If you live you know that you will see that it is paid, and if you don't live, you know that he will get it anyway;" that he said, "No; that he did not intend it that way; that he intended it for his minor heirs, his baby brother's children, to get most of his

property, and some other minor children— I don't remember just whose children they were."

The plaintiff also recalled the witness Gill, who testified in substance that the will of G. W. Hunt was in custody of the National Trust Company of Nashville, the concerns with which the witness was connected; that the will was probated in Tennessee; that outside of Texas he had found $30 in the bank at Cedar Hill, Tenn., and two notes, one for the sum of $5,000, signed by J. H. Long of Cedar Hill, and one for $2,500, signed by Mr. Winn; that he thought the note for $2,500 collectable, but the maker of the $5,-000 note was claiming offsets, but he thought they would realize about $3,000 out of it; that he knew of no other source from which collections could be made for the estate.

The plaintiff offered other testimony tending to show that the deceased was greatly attached to a nephew, Geo. E. Hunt, of Kentucky, who was about 16 years old at the time of G. W. Hunt's death, and the son of the youngest brother of G. W. Hunt, and further tending to show that he was on friendly, if not affectionate, terms with his relatives in Tennessee and Kentucky, to whom legacies have been given, as specified in his will.

[1, 2] The vital issue in this case was whether it was true, as defendant in substance claimed, that the deceased, G. W. Hunt, before his death, delivered to his brother the key to the tin box described in the evidence, with the intent of thereby conferring upon his brother, as a gift, the absolute right of possession and of property in the contents of the box. If so, it can scarcely be denied that, under the circumstances, the delivery of the key would constitute a sufficient delivery of the box, which was constructed for the purpose of excluding its contents from all persons save the one in possession of the key. While a gift of choses in action or personal property as claimed in this case must be accompanied by delivery of the property made the subject of the gift, what amounts to a delivery must be determined from all of the circumstances. It may be constructive, as illustrated in the case of Weems v. First National Bank, (Tex. Civ. App.) 234 S. W. 931. In that case the donor, before going on military service, removed to his sister's home a dresser, one of the drawers of which was locked. Upon delivery of the dresser he gave his sister a key. Upon opening the drawer, the sister found a package of papers, including a deposit slip for $300 in figures, and a note saying: "This is all yours, I will never call for it." In discussing the law applicable, the court said:

"It is true, as contended by plaintiff in error, that in order to constitute a valid parol gift causa mortis, there must be a delivery by the donor of the thing given and an actual accept-

ance of it by the donee; the transaction being such as to divest possession and control of the property out of the donor and to place it absolutely under the dominion of the donee. But actual, physical delivery of a chose in action or of an incorporeal right cannot be required. In such cases what amounts to delivery must be determined from all the facts and circumstances of the case, and constructive delivery is held to satisfy the requirements of the law."

See, also, Miller v. Williams, 195 Iowa, 1305, 192 N. W. 798; Osgood v. Carter, 110 Me. 550, 87 A. 477.

[3, 4] But we think we need not dwell upon this feature of the case, for it does not seem to be seriously contested. We think it must be further held that the evidence in the case sufficiently established that up to the time when G. W. Hunt visited the Braswell Sanitarium upon the 11th day of April, 1923, for the purpose of having an operation performed, the property in controversy found in the tin box was the property of G. W. Hunt, and that the plaintiff administrator was entitled to recover the same, unless the defendant, by a preponderance of the evidence, established the gift of said property, as claimed by him in his pleadings and upon the trial. To do this the burden of proof was on him, and in such cases it is held established, as said in 20 Cyc. p. 1223, that—

"As a general rule, to establish a gift inter vivos there must be a preponderance of clear, explicit, and convincing evidence in support of every element needed to constitute a valid gift. It is necessary to establish by this kind of evidence, competency of donor, delivery, acceptance, and the parting of the owner with his control, or right of dominion over the subject of the gift. This rule is especially applicable where the gift is not asserted until after the donor's death, and where a confidential relation existed between the parties, some decisions holding that in such cases the evidence must be as clear as that required to sustain a gift, causa mortis, and must be so cogent as to leave no reasonable doubt in the mind of an unbiased person that the demand is a proper one."

It is further said in R. C. L., vol. 12, p. 973:

"The evidence of the circumstances of a gift of an unindorsed chose in action should be full, clear, and convincing. When the claim of a gift is not asserted until after the death of the alleged donor it should be sustained by clear and satisfactory evidence of every element which is requisite to constitute a gift."

Many authorities of like tenor and effect might be cited, but the propositions so asserted will scarcely be denied.

But the material question for our determination is not whether the evidence is sufficient to support a finding in favor of the administrator on the vital issue in this case, but the question is whether the evidence as a whole, viewed in the most favorable light

to him, is such as to entitle W. W. Hunt to have the issue of his right to the property as claimed by him submitted to and determined by the jury which was impaneled in the case. If so, the court was in error in giving the peremptory instruction to which appellant has assigned error.

[5, 6] One of the constitutional and legislative guaranties of right in a citizen of this country is the right of a trial by jury. We need not trace the history of the constitutional and legislative provisions relating to this subject, for it will not be denied that with the English speaking people the right of a trial by a jury of one's peers has long been vigorously asserted and jealously guarded and maintained by our courts. And, while it is undoubtedly within the power of courts to take a case away from a jury and require a finding in favor of one or the other of contesting litigants, the rule to be applied by the court in determining whether or not this may be correctly done was thus stated by our Supreme Court in the case of Lee v. International & G. N. Ry. Co., 89 Tex. 588, 36 S. W. 63, 65:

"To authorize the court to take the question from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it."

In Mynning v. Detroit, L. & N. R. Co., 64 Mich. 93, 31 N. W. 147, 8 Am. St. Rep. 804, the rule is stated thus:

"If the circumstances are such that reasonable minds might draw different conclusions respecting the fault of the injured party, he is entitled to go to the jury upon the facts, the judge directing a verdict only when the case is susceptible of but one just opinion."

It was said in the case of Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, after a review of the authorities by Mr. Justice Denman of our Supreme Court, that—

"From a careful examination of the cases it appears, (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established—such testimony in legal contemplation falling short of being 'any evidence,' and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force."

[7, 8] After as careful a consideration of the evidence as we have been able to give, we have concluded that it cannot be said that there is not "any evidence" in support of appellant's claim of gift, and that the circumstances offered in his behalf, when construed favorably to him, only raise a mere suspicion or surmise which it is the duty of the courts to disregard. No witness testifies that the key to the tin box was not given to the defendant, W. W. Hunt, as he claims in his petition. The testimony before the jury undoubtedly tended to show that appellant was in the actual possession of the box and the key under a claim of right. It is true that his mere claim would not establish the fact, but the fact of possession and the claim explanatory thereof was relevant. The court admitted proof that the appellant received the key about 9 or 10 a. m. on the 11th day of April, 1923, during the lifetime of his brother, G. W. Hunt. If this be true, he did not surreptitiously and with fraudulent purpose obtain possession of the key of the box after the death of G. W. Hunt. It is true that the mere possession of the key prior to the death of G. W. Hunt, even if it be admitted that G. W. Hunt delivered the key to the appellant, does not necessarily prove that it was so done with the intent and purpose of conferring upon appellant the title and right of possession of the property in the tin box. The key might have been so delivered in trust that his brother might care for the property until the contemplated operation had been completed, or for delivery to others in event G. W. Hunt did not recover. But these are only inferences. Whether so or not, we think it was the right of the jury to determine. The evidence was conflicting as to whether G. W. Hunt was upon affectionate terms with his relatives in Tennessee. At least two of the witnesses testified to the effect that he said he could not live with them, and in the same connection expressed gratitude and affection for appellant. It was for the jury to determine the conflict. It was undoubtedly shown that appellant and his wife had for several years been very kind in caring for G. W. Hunt. He made his home with them, and many times expressed his gratitude for their care. There was evidence that the deceased expressed the purpose of going back to Tennessee to change some of his papers. Just what paper or papers he desired to change was not shown, but the only paper presented upon the trial of a character which would require alteration in event his purpose was to change his benefactions was his will.

[9, 10] There was evidence tending to show that appellant, during the time he was caring for his brother, G. W. Hunt, was in some financial difficulty or desirous of financial assistance, and that G. W. Hunt manifested his love for and confidence in appellant by coming to appellant's relief. It may be said also that the evidence tends to show that the deceased did not deposit the key to the tin box in the office at the sanitarium when about to be operated upon. At least it was shown that he deposited his watch and presumably other valuables in the office, and no one from that office testified that the key was among the articles so deposited. It could not have been so deposited, if true, as the court permitted both Mr. and Mrs. Hunt to testify, that ap-

pellant received the key at about 9 or 10 o'clock on the 11th day of April, 1923, and that he had retained it in his possession ever since. It was argued on the submission that it was unbelievable that G. W. Hunt would deliver the key to the tin box and make a gift of its contents to his brother, and thus deprive himself of all means of support when he presumably had a hope of recovery. This is a very reasonable inference, but must it be accepted as undisputed? G. W. Hunt was a very old man, of an age when schemes of future investments and the lure of additional accumulations do not ordinarily exist, and can it be said that a jury might not reasonably conclude from the evidence of his affection for his brother and Mrs. Hunt and from their kind care and treatment of him and other circumstances, that in gratitude, and with the confidence that should he recover, he could rely upon his brother to care for the gift of his property and care for him personally. One further fact, not heretofore referred to, is the unquestioned proof of the good character of appellant for honesty and fair dealing. This evidence was undoubtedly relevant. It came from the mouth of many witnesses, those who professed to know him well, and who, from their business positions and otherwise, seem to be persons of credibility, and more or less probably known to the jury. Such testimony was not objected to on the part of appellant, nor, indeed, could it have been, for in all cases where the charge against a party amounts to fraud or a crime evidence of his good character is competent. Under our statutes, the jury is made the exclusive judges of the credibility of the witness and the weight to be given to the testimony, and we think it was for the jury, in this case, to determine that weight should be given to the fact of appellant's good character, as well as to all other facts in the case. It was written by one of the sages of old that "a good name is rather to be chosen than great riches, and loving favor rather than silver or gold." And we venture the assertion that there are very few men of mature age who have not known others, living and dead, whose character for honesty and integrity was such that strong evidence would be required to establish a charge that they had been guilty of violating the trust and confidence of a deceased brother and of embezzling and robbing minors and other kindred to whom both alike were related, such as in effect constitutes the charge against appellant in this case, and thus destroy the priceless heritage of a good name. On the whole, therefore, we conclude that the court erred in taking the case away from the jury and giving the peremptory instruction complained of, for which error the judgment should be reversed upon the issue, determined adversely to appellant and the cause remanded.

[11-13] In view of the reversal and new trial, we think we should briefly notice several assignments of error complaining of the court's action in his rulings. Complaint of the court's action in rejecting the evidence referred to in appellant's first and second propositions, we think, is sufficiently answered by the showing in the appellee's brief to the effect that the rejected evidence was in substance otherwise admitted and before the jury. The proffered testimony of appellant himself to the effect that on the morning of April 11, 1923, while in the room at the sanitarium, and before going to the operating room, that his brother, G. W. Hunt, while undressing for the operation, took from his pocket the key to the tin box which contained the securities and property in controversy and handed the key to him and said, "I want you to have everything that is in that box, it is yours," and that witness accepted it, etc., we think was forbidden by article 3690 of our Statutes, which provides that—

"In actions by or against executors, * * * in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the others as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party," etc.

This statute, in substance and effect, is to be found in our federal enactments and in many of the states of the Union, and a very full discussion of the subject of the competency of witnesses as to transactions with deceased persons in view of such statutes may be found in Jones' Blue Book on Evidence, vol. 4, beginning on page 621 with section 772. In that article (section 780) it is said that the statute may be waived, as indeed is indicated by our own statute, if the representative of the deceased calls upon the adverse party to testify. In this case, however, appellant was not called on to testify by the plaintiff, and we recall no testimony drawn out in behalf of appellee on the cross-examination of appellant that would amount to a waiver. Further treating the subject of waiver, the author on evidence referred to, in section 783, declares that the statute may also be waived if the representative testifies, or causes other witnesses interested in the estate to testify, as to transactions or communications of the deceased. But as to other witnesses not interested in the estate, the author thus states the general rule—

"that, if the representative calls witnesses who are not interested in the estate to testify as to transactions or communications of the deceased, or incompetent with the adverse party, the testimony so given does not constitute a waiver of the right to objection to the testimony of the adverse party."

The rule as so stated is well supported by the authorities. Hence we think that the

fact that the plaintiff in this case called on Drs. Braswell and Roberts to testify as to what occurred in the office of the sanitarium did not operate as a waiver of the plaintiff's right to object to the testimony of appellant W. W. Hunt, last above referred to.

[14, 15] Appellee has also presented several cross-assignments of error, complaining of the court's peremptory instruction to find a verdict against the appellee on the notes executed by defendant as alleged in his petition, etc., but we think we cannot consider these cross-assignments. The appellee at the time did not except to the charge so given, nor did he file a motion for new trial complaining of such action, nor did he give notice of appeal from the judgment against him that was rendered in accordance with the peremptory instruction. It is true rule 101, promulgated for the government of district and county courts, provides that an appellee may file cross-assignments of error, but the application of this rule, we think, is confined to the subject-matter and relevant to the questions involved in the appeal actually prosecuted. In the case before us the causes of action as presented in appellee's petition were distinctly severable. One was a suit for the recovery of the choses in action and property described in appellee's petition—an action in the nature of the common-law action of detinue and trover. As to this feature of the plaintiff's claim, no money recovery in the way of damages for a conversion of the choses in action, etc., was sought. The other action was purely one ex contractu. Appellee alleged and sought to recover from appellant a money judgment upon promissory notes charged to have been executed by appellant, and suit on this cause of action might have been separately instituted and prosecuted. Under such circumstances we do not think the rule permitting cross-assignments of error sustain those presented by appellee in this case.

In Woeltz v. Woeltz, 106 Ky. 207, 57 S. W. 35, Judge Williams discusses the rule giving an appellee the right to file and have considered cross-assignments of error, but concludes his discussion by the statement that—

"This rule does not permit assignments of errors as between co-appellees. Anderson v. Silliman, 92 Tex. 560, 50 S. W. 576. Nor does our decision apply to a case where the appellate proceeding does not embrace a distinct part of a severable judgment of which the appellee or defendant in error seeks to complain. The question which would arise in such a case is not before us."

In Wright v. Giles, 60 Tex. Civ. App. 550, 129 S. W. 1163, it was held (quoting from the headnote) that "parties who did not give notice of appeal in the trial court cannot have judgment for costs against them reviewed," evidently for the reason that the judgment for costs was separable from and independent of the subject-matter of the litigation.

In the case of Gilmer v. Veatch, 102 Tex. 384, 117 S. W. 430, in an opinion by Chief Justice Gaines, it was held (quoting from the headnote) that—

"Cross-assignments by an appellee who had not himself taken an appeal and which do not affect the interest of the appellants in the judgment will not be considered."

Texas & N. O. Ry. Co. v. Skinner, reported in 4 Tex. Civ. App. 661, 23 S. W. 1001, was a case in which a mother sued the railway company for damages in her own right and as next friend of a minor child, and there was a verdict and judgment against her as next friend, but in her favor as an individual. On appeal by the railway company from the judgment for the mother in her individual right, the mother filed cross-assignments of error, complaining of the judgment against her as next friend of the minor, and it was held that her cross-assignments of error would not be considered, inasmuch as she did except to the judgment, and gave no notice of appeal, and filed no appeal bond.

[16, 17] In support of appellee's right to have his cross-assignments of error considered, he urges a written agreement signed by counsel for both plaintiff and defendant to the effect that plaintiff's cross-assignments of error might be incorporated in the transcript on appeal, and that, as so presented, they might be considered by the appellate court. But we are of opinion that counsel cannot give this court jurisdiction by mere agreements. Our jurisdiction is defined by the written law, and cases not brought within our power of revision by notice of appeal and other requirements cannot be considered.

We accordingly finally conclude, for the reasons stated, that the judgment below, in so far as the issue between the parties relating to the choses in action and other property alleged by plaintiffs to be unlawfully detained by defendant, be reversed, and the cause remanded for another trial, but that plaintiff's cross-assignments of error be not considered, and that the judgment below in appellant's favor on the issue of his liability upon the promissory notes alleged to have been executed by him be left undisturbed in accordance with rule 62–A for the courts of Civil Appeals, which reads in part as follows:

"If it appears to the court that the error affects a part only of the matter in controversy, and the issues are severable, the judgment shall only be reversed and a new trial ordered as to that part affected by such error."

## On Motion for Rehearing.

Appellee strenuously insists that in disposing of this case on original hearing we were led into error by failing to distinguish between the character and the quantum of

evidence requisite to support a gift inter vivos. He quotes from 20 Cyc. p. 1223, R. C. L. vol. 12, p. 973, and other authorities of like tenor, to the effect that to support such a gift the evidence must be "clear, explicit, and convincing," and then asserts as a proposition that—

"By 'clear, explicit and convincing evidence' is meant the 'kind,' as contradistinguished from the 'amount,' of evidence required to establish the gift. It means that the evidence of the gift must be direct, positive, express, and unambiguous; that resort should not be had to inference or conjecture."

Upon the foregoing premises the further proposition is asserted that—

"Whether the evidence in this case was such as to entitle defendant below to have the issue of gift submitted to the jury was a question of law; and in passing on this question it was for the trial judge to determine as a matter of law whether the evidence measured up to the standard required in this character of case, i. e., whether the evidence of gift was 'clear, explicit and convincing.' "

The conclusion appellee reaches is that the evidence in support of the gift alleged by appellant is plainly not "clear, explicit and convincing," and hence it was for the court, as a matter of law, and not for the jury, to determine and declare the character and legal effect of the evidence, and to accordingly direct a verdict in harmony with the character of the evidence as determined by the court.

Appellee cites in support of the conclusions above indicated a number of decisions. We will notice a few of them. The case of Stewart v. Tolar & Daniel, 250 S. W. 278, by the Beaumont Court of Civil Appeals, was one in which a gift of a chose in action was asserted. The court quoted from the Iowa case of Runnels v. Anderson, 187 Mo. App. 720, 173 N. W. 91, the general rule that one asserting a gift must prove all of the essential elements by "clear, satisfactory, direct, positive, express, and unambiguous evidence." But in both cases the court was passing on the sufficiency of the evidence upon which the finding of a gift of land in one case and against a claim of choses in action in the other rested. In other words, the courts were passing on the quantum of evidence, and quoted a rule relating to the required character in aid of their conclusion as to the quantum or sufficiency shown. Neither case discusses nor determines the question of whether the trial court should have given a peremptory instruction to the jury. The same is to be said of the case of Combest v. Wall, 102 S. W. 147, by the Dallas Court of Appeals, and the case of Martin v. Martin, 207 S. W. 188, by the Galveston Court of Appeals, and Carl v. Settegast, 211 S. W. 506, by the Beaumont Court of Appeals. In each of those cases the stress laid on the rule invoked was merely to make clear the guide or standard

by which the court should measure or determine whether the evidence as a whole was sufficient. There was no discussion or determination of the question of whether the trial court should have given a peremptory instruction, which is the question before us.

In the Settegast Case the Court of Appeals approved an instruction to the jury to the effect that the plaintiff "must establish clearly and by a preponderance of the evidence the alleged secret parol trust which she now seeks to ingraft upon the deed made by her to her father May 18, 1882, and the burden of proof is upon her to show by a preponderance of the evidence, and to establish clearly to the satisfaction of the jury, that the deed above referred to was given for some purpose other than the purpose expressed upon its face and by its language; and unless the jury finds from a preponderance of the evidence that the proof offered meets these legal requirements question No. 1 should be answered in the negative."

Issue No. 1 referred to was whether it was mutually understood and intended by the parties to the deed of May 18, 1882, that the interest claimed by the plaintiff should be held by the grantee in trust for her. A writ of error was granted in that case by the Supreme Court. See Carl v. Settegast (Tex. Com. App.) 237 S. W. 238. Section B of the Commission of Appeals, in disposing of the case in an opinion by presiding Justice McClendon, among other things, had this to say:

"The leading inquiry presented for our consideration is whether it was error to charge the jury, in effect, that to overcome the presumption that the deed of settlement was not absolute, as upon its face it appeared to be, but was affected with a parol secret trust in favor of plaintiff, the latter must establish such trust clearly and to the satisfaction of the jury. The character of charge to be given to the jury in a case of this character has been considered by the Supreme Court in a number of cases extending back to the earliest times; and it may be regarded as singular that the question now before us should, at this time, present any serious ground of controversy. The rule that to ingraft a parol trust upon an instrument absolute on its face the evidence must be clear and satisfactory arose at a time when suits of this nature were cognizable only in courts of chancery, where all matters of fact, as well as the law, were tried by the chancellor, and where questions of facts addressed themselves to the conscience of the chancellor. The aid of a jury in such cases was discretionary, and their findings, when called for such aid, were not binding absolutely upon the chancellor, but merely persuasive and advisory, and subject to be disregarded at his discretion. In so far as the rules of evidence thus announced by the chancery courts are rules of law, they should be regarded as binding upon our courts; but, in so far as these rules merely address themselves to the conscience of the chancellor in exercising his province to pass upon the facts or weight of the evidence, they have no place in our jurisprudence, under which, whether the

case be one cognizable alone in equity or one at law, a jury trial is given as a matter of right, and the province of the jury where the evidence is sufficient to have the issues submitted to them is absolute in determining the facts, subject only to review by the trial court and Court of Civil Appeals. In passing upon the sufficiency of the evidence as a matter of law it is the province, not only of the trial court and Court of Civil Appeals, but also of the Supreme Court, to determine whether the evidence meets the requirements under the rules of law as to the quantum of proof necessary in the particular character of case. It has been ruled that the evidence establishing a secret parol trust must be clear and satisfactory, and it may be conceded that this is a rule or standard by which the evidence is to be measured as a matter of law. We had this question for consideration in the recent case of Briscoe v. Bright [Tex. Com. App.] 231 S. W. 1082, from the opinion in which case we quote:

" 'The sufficiency of proof to meet the requirement that it should clearly and satisfactorily establish a contract which the courts can enforce is presented here only as a question of law. Conceding for the purposes of this case that the contract sought to be enforced falls within the rule requiring that its terms be proved clearly and satisfactorily and treating the question as one of law only, the evidence must be viewed most strongly in support of the trial court's judgment. The fact that the witnesses who testified may not have been disinterested, or may have made conflicting statements, or that their credibility may have been attacked, are matters with which it is not our province to deal. As we understand the rule contended for, it is not violated by objections to the evidence of this character. It only requires that the terms of the contract essential to recovery be supported by evidence sufficiently clear for the court to determine what those terms were without resorting to inference or conjecture. In this, as in every other class of cases that we now recall, the credibility of the witnesses and the weight to be given to their testimony are questions solely within the province of the jury, subject, however, to be revised by the trial judge and the Court of Civil Appeals.' "

The opinion of the Commission was not only adopted by the Supreme Court, but express approval was given to the holding of the Commission on the question discussed.

The right of a litigant to a trial by jury is guaranteed under our laws, and the jury is expressly made "the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony." It has been many times decided that to authorize the court to direct a verdict the evidence should be so strong that reasonable minds could come to but one conclusion. See Rickard v. Bemis (Tex. Civ. App.) 78 S. W. 239; Lamberida v. Barnum (Tex. Civ. App.) 90 S. W. 698; McCartney v. McCartney (Tex. Civ. App.) 53 S. W. 388; Id., 93 Tex. 359, 55 S. W. 310; Hutchens v. Railway Co., 40 Tex. Civ. App. 245, 89 S. W. 24; St. Louis S, W. Ry. Co. v. Demsey, 40 Tex. Civ. App. 398, 89 S. W. 786.

In Bowman v. Texas Brewing Co., 17 Tex. Civ. App. 446, 43 S. W. 808, it was held, in effect, that, if there is any evidence to sustain a cause of action or defense, the case must be submitted to a jury.

[18] Where there is some evidence tending to support the affirmative of an issue, it cannot be taken from the jury. Heatherly v. Little (Tex. Civ. App.) 40 S. W. 445; Willis v. Thacker, 20 Tex. Civ. App. 233, 49 S. W. 128; Clark v. Wilson, 41 Tex. Civ. App. 450, 91 S. W. 627.

In Merritt v. State, 42 Tex. Civ. App. 495, 94 S. W. 372, in an opinion by the lamented Justice Neill, of the San Antonio Court of Civil Appeals, it is said:

"It is now too well settled in this state to require citation of authorities or discussion of the principle that an issue of fact should not be taken from the jury, except in cases where there is no material conflict in the evidence, and where there is no room for different minds to draw different inferences from it; and that it is only where the state of the testimony is such that but one conclusion can be deduced from it by ordinary minds that the question at issue becomes one of law, and the court is authorized to peremptorily instruct a verdict upon it."

It seems superfluous to cite further authority on the subject under discussion, but what was said by Mr. Justice Wheeler, one of the ablest judges who ever graced our Supreme Court, in the case of Carter v. Carter, 5 Tex. 93, seems so pertinent that we here venture to quote the following from that opinion.

"In Pennsylvania, where, as with us, there is no separate court of chancery, it is held 'that if the question of a mortgage or not, depends upon written instruments, it is for the court to decide, but if on written and parol evidence, it is within the province of the jury to determine. 5 Binn. R. 499.

"The Constitution of this state (article 4, § 16) has settled what shall be the province of the jury, in this class of cases, by providing that in all causes of equity cognizance, the parties may have a trial by jury, 'to be governed by the rules and regulations prescribed in trials at law.' The same effect and consequence must therefore be given to the verdict of the jury, in this class of cases, as in those which, where there are separate jurisdictions, are properly cognizable in a court of law. The court must determine upon the admissibility of the evidence; but it is the exclusive province of the jury to judge of the weight to which it is entitled. If the evidence is admissible, as conducing in any degree to maintain the issue, whether it shall satisfy the jury of the truth of the fact which it conduces to prove, is a question which must, of necessity, belong to them to determine. And though it might not be sufficient to satisfy the mind of the judge, sitting as a chancellor to decide the facts; yet if it has satisfied the jury, the court, and especially an appellate court, will not set aside their verdict, merely because the evidence might not be deemed, by a chancellor, sufficient proof of the disputed fact. That would be to trench upon

the right of trial by jury in this class of cases. It would be, in effect, to hold the verdict legal and effectual, only in case it was in accordance with the opinion of the judge; but to render it a nullity, and, of consequence, to deny the right of a party to have the trial of the fact, by a jury, unless they should arrive at a conclusion in accordance with the opinion of the judge.

"When the Constitution has submitted to the jury the trial of the question of fact in a case like the present their finding is entitled to the same weight and is of the same conclusive character, respecting the facts properly submitted to them, as in any other case. It is impossible for the law to prescribe rules by which the minds of jurors shall be conducted to their conclusion; or to define the weight which they shall give to evidence. That is a subject which is not susceptible of legal definition.

"The question to be decided in this case, being that of a mortgage or not, depended upon the actual understanding and intention of the contracting parties, the nature and tenor of the contract, and the existence of the alleged parol defeasance. To this point, in the absence of any direct and positive proof, recourse was had to circumstantial evidence, consisting of the acts and parol declarations of the parties. Their conduct and conversations upon the subject, both before and after the making of the bill of sale, were relied on to show what was their real purpose and intention at the time and in the act of its execution; and were circumstances from which the jury were to infer the real character of the transaction; and to determine whether the bill of sale was, in fact, executed and intended, as alleged, only as a security for the payment of money. That it was so executed and intended, the jury have, in effect, found; and we cannot say that they have found without or contrary to evidence. There was evidence conducing, at least in some degree, to this conclusion; and from a view of all the evidence in the record, it is not, perhaps, less probable than the opposite conclusion. But to judge of the degree of probability and the weight of evidence, belonged to the jury. These were subjects within their peculiar and exclusive province. And when they have confined themselves within their appropriate sphere, and have acted upon a subject within their peculiar province, the court will not set aside their verdict and grant a new trial, merely because they might, upon an examination of the evidence, have arrived at a result different from that attained by the jury, or because the verdict is against the mere preponderance of testimony or the weight of evidence; nor merely because it may appear to them to be founded upon slight evidence. Wendell v. Safford, 12 N. H. 171; Owings v. Gray, 2 A. K. Marsh. (Ky.) 520; Miller v. Simpson, 2 Mill, Const. (S. C.) 431; Dickson v. Parker, 3 How. (Miss.) 219, 34 Am. Dec. 78; Alsop v. Commercial Ins. Co. (Fed. Case No. 262), 1 Sumn. 451; Goodman v. Smith, 4 Dev. (N. C.) 450; Angus v. Dickerson, 1 Meigs. (Tenn.), R. 459.

"It cannot, with justice, be objected, that there was entire absence of proof, in this case. The most we can say is, that it was of doubtful import. And where the proof is of doubtful interpretation, it is said, if the verdict can be sustained in either aspect of the proof, it should not be disturbed. (6 Da. R. 395.) And

a verdict will not be disturbed merely because it rests upon inferences drawn from circumstances not conclusively established. Price's Heirs v. Evans, etc., 4 B. Mon. R. 386.

"Again, it has been held that an appellate court will not disturb the verdict when there was any evidence in support of it. Findley v. Patterson, 2 Mon. R. 76; Dodge v. Brittain, 1 Meigs. (Tenn.) 84."

[19] We think the proper conclusion to be drawn from the authorities is that in a jury trial, if the evidence admitted is of probative force in support of or against a material issue, whether arising in law or equity, its weight and effect is for the jury. It is for the jury to settle conflicts, to judge of the credibility of witnesses, and to draw such inferences and conclusions from the facts proven as to them seem reasonable and right. The court is left a proper field for the exercise of his powers in determining, as a matter of law, whether the evidence offered on the trial, when objected to, is relevant and competent, and whether, after verdict, the evidence as a whole is sufficient to support the jury's findings.

[20, 21] We accordingly adhere to our conclusion that the evidence in this case, as pointed out in our original opinion, was such as to require a submission of the case to the jury; nor is such conclusion affected by appellee's further contention to the effect that Mrs. Hunt was disqualified as a witness, under the statute, to testify as to transactions with the deceased, and that hence her testimony, even if admitted without objection, is incompetent, and cannot form the basis for a verdict and judgment. At the time of the admission of Mrs. Hunt's testimony objection thereto was made in behalf of plaintiff, but the objection was overruled, and appellee has not cross-assigned error to the ruling, so that we think the only objection now available to appellee is that her testimony is without probative force. We cannot think it allowable, as in effect contended in appellee's argument in support of the motion for rehearing, for a party to deliberately and supinely permit without objection the introduction of evidence offered by his adversary, or to so waive objection made, and thus speculate upon the chances of its operating in his favor, and then afterwards on appeal insist upon its rejection on the ground that at the time of its introduction the evidence was subject to some lawful objection other than a want of probative effect. We do not think it can be said that in suits of the character of the one here the statute forbids the testimony of an interested party relating to statements by or transactions with the deceased, on the ground that such testimony is without probative force. It may be, and often is, if admissible, of clearest force. The statute was evidently enacted for the protection of the opposite party, and may be waived. In the case of Walker v. Fields,

247 S. W. 272, it was held by our Commission of Appeals, quoting from the headnote, that—

"The objection that one who was a witness to and the named executor of a nuncupative will was disqualified as proponent thereof from testifying to the speaking of the testamentary words, under Rev. St. art. 3690, as to transactions with a testator, could not be first raised on appeal; and his unobjected to evidence was not without probative force."

The same rule was recognized by the United States Supreme Court in the case of Diaz v. U. S., 223 U. S. 442, 32 S. Ct. 250, 56 L. Ed. 503, Ann. Cas. 1913C, 1138, in discussing hearsay evidence admitted without objection. It was said:

"So, of the fact that it was hearsay, it suffices to observe that when evidence of that character is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible."

We conclude that appellee's motion for rehearing should be overruled.