## Lone Star Brewing Company v. Hugo Willie.

### Decided December 9, 1908.

**1.—Negligence—Question of Law, when.**

A question of negligence only becomes one of law when the facts are undisputed and are such that reasonable minds may draw but one conclusion from them. The rule which requires a question of negligence, when not one of law, to be submitted to the jury has reference to the particular question raised by the pleadings, and unless such question is raised by both the pleading and the evidence, there is nothing to submit. Neither pleading without evidence, nor evidence without pleading can raise an issue which should be submitted to a jury.

**2.—Personal Injuries—Loading Ice Wagon—Master and Servant—Negligence—Insufficient Proof.**

In an action by an employee against his master for damages for personal injuries received while loading an ice wagon, evidence considered, and held insufficient to support the particular allegations of negligence charged against the defendant in the matter of furnishing safe appliances with which to work, and hence insufficient to raise an issue for the jury to pass upon.

**3.—Master and Servant—Negligence—Res Ipsa Loquitur.**

Negligence cannot be inferred from the mere happening of an accident except in cases where the acts of the defendant speak negligence. The doctrine of res ipsa loquitur is not an exception to the rule; it applies only in cases where the circumstances in proof show that the accident would not have happened if due care had been exercised. Evidence considered, and held not to come within said rule.

**4.—Master and Servant—Safe Appliances—Rule.**

The principle that it is the duty of the master to see to it that appliances furnished for the use of his servant are reasonably safe, does not extend so far as to require him to attend to the regulation of those parts which necessarily have to be adjusted in the course of use and with regard to the particular work to be done, and the adjustment of which is incidental to the ordinary use of the appliance. Evidence considered and rule applied.

**5.—Master and Servant—Contributory Negligence—Evidence.**

A servant will not be allowed to shut his eyes to those things that would be obvious to a man who is ordinarily vigilant in protecting himself from injury and, in case of injury, hold the master responsible. Evidence considered, and held to show that the servant was necessarily guilty of contributory negligence.

### ON REHEARING.

**6.—Negligence—Res Ipsa Loquitur.**

When the mere happening of an accident may be the effect of some other cause than the negligence alleged as its cause, the doctrine of res ipsa loquitur does not apply, and the happening of the accident must be shown by evidence to have been the result of the negligence alleged.

Appeal from the 45th Judicial District, Bexar County. Tried below before Hon. J. L. Camp.

*Onion & Henry* and *Wm. Aubrey,* for appellant.—"The mere fact that an accident happens or an injury occurs, is not of itself proof of negligence." Trinity Co. Lumber Co. v. Denham, 85 Texas, 60.

"Where the servant has equal knowledge with the master of the danger incident to the work, he takes the risk upon himself if he goes on with it." Galveston, H. & S. A. R. v. Lempe, 59 Texas, 19.

"The risk to the servant was not such as to require any precaution on the part of the master." San Antonio Gas Co. v. Robertson, 56. S. W., 323.

"The servant seeking to recover for any injury takes the burden upon himself of establishing negligence on the part of the master and due care on his part." Texas & N. O. R. v. Crowder, 63 Texas, 502.

"The servant assumes the ordinary risk of his employment, and if any defect in any tools or machinery placed in his hands becomes apparent in their use it is the duty of the servant to observe and report to the employer, for the servant has the means of discovering defects which the master has not." Philadelphia & R. Ry. v. Hughes, 13 Atlantic Rep., 286.

The court erred in refusing to instruct the jury in accordance with defendant's special charge No. 1, to find for defendant, because all the evidence before the jury showed that the injuries complained of by plaintiff were caused by his own negligence or that his own negligence proximately caused or contributed thereto. Broadway v. San Antonio Gas Co., 60 S. W., 270; San Antonio Gas Co. v. Robertson, 56 S. W., 323; Galveston, H. & S. A. Ry. v. Walker, 76 S. W., 228; Fort Worth Iron Wks. v. Stokes, 76 S. W., 231.

The court erred in refusing to instruct the jury to find for defendant in accordance with defendant's special charge No. 1, because all the evidence before the jury showed that defendant was not guilty of any negligence as charged in plaintiff's pleadings, causing or contributing to plaintiff's alleged injuries. Trinity Lumber Co. v. Denham, 85 Texas, 60; Broadway v. San Antonio Gas Co., 60 S. W., 270; Texas & Pac. R. v. French, 86 Texas, 96; Galveston, H. & S. A. R. v. Lempe, 59 Texas, 19; Currie v. Missouri, K. & T. Ry., 20 Texas Court Rep., 686; San Antonio Gas Co. v. Robertson, 56 S. W., 323; Texas & N. O. R. v. Crowder, 63 Texas, 502; Relyea v. Tomahawk Pulp & Paper Co., 85 N. W., 960; Philadelphia & R. Ry. v. Hughes, 13 Atl., 286; La Pierre v. Chicago & G. T. Ry., 58 N. W., 60; Allen v. Smith Iron Co., 160 Mass., 557; Toledo, W. & W. R. v. Eddy, 72 Ills., 138; Baker v. Allegheny R., 40 Am. Rep., 635.

The evidence discloses that appellee daily used and was in charge of the appliance for loading the ice, and this being true, it was his duty to see that it was kept in repair, and if same was not in repair and he continued its use and was injured thereby, then appellant cannot be held responsible. Baker v. Allegheny R., 40 Am. Rep., 634; Toledo, W. & W. R. v. Eddy, 72 Ills., 138; La Pierre v. Chicago & G. T. R., 58 N. W., 60; Relyea v. Tomahawk Pulp & Paper Co., 85 N. W., 960; Philadel-

phia & R. Ry. v. Hughes, 13 Atl., 286; Allen v. Smith Iron Co., 160 Mass., 557.

*Nat B. Jones* and *Marcus W. Davis,* for appellee.—The trial court was right in submitting to the jury the question of appellant's negligence in the premises. Galveston, H. & S. A. Ry. v. Cherry, 98 S. W., 898; Gulf, C. & S. F. Ry. v. Haden, 68 S. W., 530; Gulf, C. & S. F. Ry. v. Wood, 63 S. W., 164; San Antonio & A. P. Ry. v. Lindsey, 65 S. W., 668; Galveston, H. & S. A. Ry. v. Jones, 68 S. W., 190; Currie v. Missouri, K. & T. Ry., 108 S. W., 1170.

NEILL, Associate Justice.—This suit was brought by appellee against the appellant to recover damages for personal injuries. The allegations contained in plaintiff's first amended original petition and his trial amendment thereof are in substance as follows:

That on October 10, 1906, defendant owned a brewery and maintained, in connection therewith, an ice house in which were stored large blocks of ice; that at the time plaintiff was in defendant's employ as a common laborer; that in loading a wagon with ice, a chute extending from the ice house and a plank or skid extending from the end of the chute to the wagon were used in conveying the blocks of ice; that the chute was about fourteen feet long and about fourteen inches wide, and the skid, which extended from the chute to the wagon, about four and one-half feet long; that at the time of plaintiff's injury the skid was connected with the chute by being inserted in a slot, cuff, groove, fastenings and connections at and under the mouth of the chute; that the said slot, cuff, groove, fastenings, and connections of said ice chute were weak, insufficient, old, worn, slick, and not sufficiently tight, strong and secure to hold, and especially to hold in position on the wagon, the board, plank, or skid to be used and inserted therein on this occasion, being the one furnished by defendant for that purpose, and that by reason of the aforesaid condition of said groove, slot, cuff, connections and fastenings the use of said chute and board, plank or skid for the purpose aforesaid was extremely dangerous and unsafe to those using same in the accustomed way and in the way plaintiff was then using same to convey ice over and along them to and upon defendant's wagon or wagons, and said condition rendered it unsafe and dangerous for employes and plaintiff using said appliances for said purpose, in that in the aforesaid condition it did not sufficiently hold the said plank or skid in position or place upon the wagon to be loaded, but permitted and allowed it to move and become displaced while being used for said purpose, thereby exposing employes using the same for said purpose in the accustomed way, and specially this plaintiff, to danger and injury.

"That plaintiff, at the time of his injury, did not know of the said defective, unsafe and dangerous condition of the ice-chute, and particularly of the groove, slot, holdings, fastenings and connections at the point of connection with the board, plank or skid used therewith, and while plaintiff was in the act of conveying ice over and along said appliances by means of the same, and while standing upon said plank for said purpose, as was usual and necessary under the circumstances, the end of said skid, plank or board, resting upon said wagon, by reason

of the defects aforesaid, moved, slipped, was displaced and fell, whereby plaintiff was directly thrown upon the ground, and the said large block of ice, which he was loading, was precipitated upon his right hand and the fingers thereof, thereby severely cutting, mashing, bruising, lacerating and injuring said hand, and especially the forefinger and the two middle fingers thereof, so that by reason of said injuries it became necessary for said forefinger to be amputated, which was done, and two of the other fingers of said hand were rendered stiff and useless to plaintiff, whereby the use of said fingers has been permanently destroyed, impaired and injured and plaintiff has lost the free and full use of said hand and fingers; that all of his injuries are permanent, and have, and will in the future diminish plaintiff's capacity to use his said hand and to do physical labor;" and that by reason of his injuries, so negligently inflicted, plaintiff has been damaged in the sum of $10,000.

The defendant answered by general and special exceptions to plaintiff's petitions, a general denial and by pleas of assumed risk, and contributory negligence.

The trial resulted in a verdict and judgment in plaintiff's favor for the sum of $5,000.

As the tenth assignment of error complains of the refusal of defendant's request of a peremptory instruction of a verdict in its favor, we must examine and consider the evidence in order to determine whether the court erred in refusing the request.

The insistences of defendant are that there is no evidence tending to prove the allegations of its negligence, and that the evidence shows as a matter of law that plaintiff's injuries were incurred either from a risk incident to his employment, or from his contributory negligence. If, therefore, this assignment should be sustained, it will become unnecessary to consider any of the others; for in that event (the evidence having been fully developed upon the trial), our duty will be to reverse the judgment and render one for the defendant.

In considering the question we shall bear in mind the principle that it is only when the facts are undisputed and are such that reasonable minds may draw but one conclusion from them, that the question of negligence is ever considered one of law by the court. The "question of negligence," however, to which this rule is referable is one that is made by the pleadings; for courts have nothing to do with an issue that lies entirely outside of them, though the testimony may, if the matter were pleaded, raise such a question. An issue of fact, in order to authorize its submission to the jury, must arise both from the pleadings and the evidence. From this it follows that, though the pleadings may authorize the admission of testimony upon an issue made by them, if there be no evidence tending affirmatively to support it, there is nothing to submit to the jury, and it becomes the duty of the court, if it is essential to plaintiff's case to prove the affirmative of the issue, to peremptorily instruct a verdict for the defendant.

It will be observed from our statement of the pleadings that it was essential to plaintiff's recovery for him to prove affirmatively his allegations, or some of them, that the slot, cuff, groove, fastenings and connections of the ice-chute were weak, insufficient, old, worn, slick, not sufficiently tight, strong and secure to hold in position on the wagon the

plank or skid furnished by defendant to be inserted therein on the occasion of his injury, and that by reason of such defective condition of said groove, slot, cuff, connections and fastenings the use of the plank or skid for the purpose stated was dangerous and unsafe to those using the same in the usual way and manner plaintiff was using it when injured; that it was negligence in defendant to furnish its servants with such defective appliances for use, and that such negligence was the proximate cause of plaintiff's injuries.

The allegations as to the defects in the ice-chute are somewhat ambiguous and obscure. If the words "slot, cuff, groove," were intended to relate to and qualify the words "fastenings and connections," and if it should appear from the evidence that the chute had no such fastenings and connections as are characterized by the words, "slot, etc.," or any of them, there would necessarily be a total failure of proof upon the issue of defendant's negligence. If, on the other hand, it was not intended that the words "fastenings and connections" should be limited or characterized by the words slot, etc., there would be no allegations as to what the "fastenings and connections" of the ice-chute were. If, therefore, it were necessary to pass upon the assignments of error which complain of the court's overruling the special exceptions to plaintiff's petitions which point out the uncertainty of the allegations as to defendant's negligence, we should be strongly inclined to sustain the objection. But, as, under our view of the evidence, the case can be disposed of by giving plaintiff's pleadings the most favorable construction to him they will bear, it is unnecessary to pass upon the sufficiency of his pleadings in this regard.

Now, in determining the questions raised by the assignment first referred to, we will review the evidence.

It is undisputed that on October 10, 1906, the plaintiff, while in defendant's employment, and engaged in loading one of its ice wagons and in the act of lifting and placing thereon a large block of ice weighing about two hundred and ten pounds, was thrown to the ground by reason of the plank or skid he was standing on, which extended from the end of the ice-chute to the wagon, slipping from its place, and that the ice fell upon and injured his hand as alleged in his petition.

The plaintiff had been working for defendant thirteen months when injured. During that time he did any kind of work defendant required of him, and when injured was engaged in hauling ice, helping the car-loaders and hauling beer; but had been engaged in loading ice off and on as long as he worked at the brewery, and was familiar with the methods adopted and the appliances used by defendant in loading ice; and he described them thus: "The distance between the door of the ice house, from which I took the ice to be loaded, was, I think, at least eighteen steps, between sixteen and eighteen feet. The blocks of ice were conveyed from the door of the ice house over a chute, or slide, into the wagon. There is a big platform where the chute is on from the ice house hole, . . . where the ice is dumped out of the cans into this chute, and it comes down into the wagon. Only the chute extends as far as the big platform and then the wagon stands between four and four and one-half feet from the big platform, about four feet, and there is a little groove. The chute was between thirteen and fourteen feet long;

the width of the chute is about fourteen inches or fifteen inches on the outside and something like twelve or thirteen inches on the inside. This chute had side-boards on it which were eight inches high; there were two slats on the bottom of the chute which ran lengthwise. The platform and chute together were about four feet from the ground. It was about four feet from the mouth of the chute, where it connects with the skid or plank I used to put ice into the wagon, to the ground. The chute from the ice house slanted down. It was lower at the wagon, I guess about three inches, something like that. It was about four feet from the mouth of the chute to where the wagon usually stood to be loaded. We used just a common one by twelve plank, which was about four and a half feet long, to get the ice from the mouth of the chute onto the wagon. We just slide the ice over the plank chute right into the wagon . . . until you had the wagon nearly loaded, and then you would get on the platform and stop it and slide it up to get it over to the wagon. From the mouth of the chute where the plank connects to the point where it rests on the wagon on which the ice is put, it was up grade. The wagon was a little high. The ice, from the ice house down to the mouth of this chute, always came by itself, until we got pretty nearly through loading the wagon, and then we had to get off and stop it. It would go all the way by itself into the wagon if you would let it go; but we could not, of course, the wagon was loaded pretty near, so it was crowded, had to be with it and stop it, or else it would break the ice up. When we got the lower layer of ice on the wagon we always stood it up, raised it up in the wagon, I say we raised the ice up on end and shoved it into the wagon until the wagon was loaded. We only put one block of ice in the chute at a time. When we put it in the chute I was generally on the wagon. Some one else on the ice tank, whom we called the ice-puller, would start the ice down. When the ice is so I can't stand on the wagon any more, . . . I have to get off the wagon and end it up in the chute, and then slide it over to the wagon and get it over the plank. We would have thirty-five bars of ice on the wagon before I would get off of it. Forty bars cover the wagon bed. When we end the blocks of ice we don't put ice upon the first layer. We don't load such a load all the time, but whenever it happens, about once a day and sometimes a dozen times, just depends on what kind of loads we have to take, how much ice we have to put in the car."

He thus describes the happening of the accident: "On this occasion, at the time I began handling this last piece of ice, I had thirty-nine bars of ice on the wagon. I had got off the wagon, I had to because I wanted to get that last bar so I could get that in and I wanted to put forty bars in the wagon. I had to put forty bars in the wagon. I was putting the last bar on the wagon too, not on top of the other ice, but right next to it, right close where the board was laying on the wagon. It was necessary to get off the wagon to handle it. When I got off the wagon I caught the block of ice in the chute, I caught it in the chute with the ice tongs. I ended it up on the end and slid it over toward the wagon and held it on there and got on the plank, and then went to push it over, and I felt something giving away, and I sorter turned around to look, and the plank slipped to one side and, of course, slipped out with the bar right after, and I fell to the ground and, of course, I threw out my

hands and the bar came right over and fell, with the ice-tongs, on my hand and mashed my finger off. I got on this skid right next to the chute, the end of the chute, to handle that bar of ice. I followed up this bar of ice, pushed it up onto the wagon. When I was attempting to do this, I put the ice on the wagon and tried to push it on the wagon with my hands. The reason I got on top of this skid was because I could not get it on the wagon from the ground, it is too high. I had done this before lots of times. The other employes loaded in the same way. Whenever I was doing something else there were others that loaded, but then there were so many of them, different ones, they had to do that same work. I got on this skid or plank because I had to put the ice on the wagon. I could not do that by standing on the ground. This skid or plank connects with the end of the chute in a groove; there is a groove in the chute under these slats the plank was resting on and in. The width I don't know exactly, but then there is a two by six or two by eight, whatever it was I don't exactly know. The ice-chute, the fastenings, and this groove or slot were made of wood. We would stick the skid or plank right into the groove under the mouth of the chute. The plank was resting then on a two by six or two by eight slat or support as I stated a while ago.

"You see, if this was the plank, the slide would come down, it didn't extend out as far as this, it was just narrow like, and this here was along the top there and something tight against it in the back and this here was laying on the wagon this way, the plank now, the one by twelve, it is supposed to have been—it was about three and one-half inches from the bottom of the mouth of the chute down to this plank underneath the chute. On the under side of the mouth of the chute there were pieces that would stand, two by eight. With also pieces that were fastened on here that were grooved in, and then another piece where the legs were on, goes so (indicating), standing on this piece of plank so (indicating), what I mean to say, standing on underneath there. Underneath the mouth of this chute, about two or three inches, there was a plank fastened to the under side of the chute on which this board or skid would rest. The two by eight side-boards of the ice-chute also extended down and were on each side of the plank on which the skid or board would rest. They were on each side to hold this skid or plank in position. They were not slats but planks; they went all the way down to this piece here (indicating plank bottom of groove or slot as shown on defendant's model).

"This groove, or slot, into which we would put this skid or plank, had planks two by eight on each side, called the slats or side-board like. We had been using the chute ever since I came there and I have been working with it there. The chute was there when I came there and I worked with it, worked on there. They had to get a new plank every once in a while. Guess they had been using this particular plank about a month, month and a half, or two months, may be. We generally took the measure of the chute and skid by the old ones, and then the carpenters sometimes fixed one up for it. The Brewery furnished these fixtures to us to use. The fastenings or fixtures underneath the mouth of the chute, into which the plank or skid was put, set back from the mouth of the chute about three or three and one-half inches, something

like that. In inserting the skid or plank in the groove or slot in the usual way you could not see any of the groove or slot. I never did examine it so close so as to tell whether it was in good condition or not, because I always had orders to work with it, and then I thought it was all right. I was loading the ice, and when I had about thirty-five bars on the wagon, I had to get off and catch every bar and push it on and get up on the plank and then push it onto the wagon. Of course, so that went on until the last bar, that had a pretty close edge to get it on the wagon and I did the same thing, got on that plank again, and when I tried to get it on it was pretty near the wagon and I felt something slip, and I just turned myself around and I saw one of those planks giving way right at the chute like; the plank slipped out from under me, and I fell backwards, the ice right after me, and it fell on my hand. I had the ice-tongs in my hand yet. I just happened to see the fastenings of the groove or slot were old and worn then, of course, just then, after that happened. Of course, I had no business to examine anything.

"The plank in the chute gave way. The end of the chute the plank was sticking in gave way. The plank slipped out, sort of give a little and I fell and it altogether with me. The fastening of the groove or slot was old and worn wood, that is, the part that the groove is in that slipped like. I was facing the wagon, the end of the plank on the wagon moved altogether, moved in the chute and out of there and bound to, when it fell down. The plank fell to the right, I saw just at the moment when I fell that the plank was pressing itself out at the slot, giving way on these here slats, when I fell with the plank like. I fell about three and one-half to four feet and struck on the rock floor that they have there, when I fell. I went first before the ice. The ice followed me pretty close, it struck me right on the hand. The weight of the bars of ice at that time was between two hundred and ten and two hundred and twenty pounds. This block of ice when it fell struck me first on the hand. I had the ice-tongs in my hand and fell with the ice-tongs in my hand. It was the right hand. When I fell I threw my arms out and got hold of the platform—there was the big platform —the ice struck on the platform and I was laying like this on the platform (illustrating) just like that (indicating) I fell backward and caught hold of this platform and the bar fell right on there."

On cross-examination he testified: "I made the arrangements for loading the ice without the assistance of anyone, placing the wagon in position and also the plank leading from the chute into the wagon. . . . The plank extended into the groove three and half or four inches. The platform and the chute were even, and the groove right under the chute. I was standing longways on the plank when I fell. The plank moved in the back and then came over this way and twisted out. The grove just gave way back here. Something gave way, I don't know how it was, it twisted out some way. I say it looked so, I could not see it of course. I never saw anything break and never saw anything come out of position only in the way I have mentioned. I only saw the plank come out the groove the way I stated. I didn't get any chance to look much, I felt it turn like, twisted back there and turned myself around and it came down and it seemed to me it was twisted out there just at the moment I was falling. I saw nothing

give way nor break, the only thing I saw as I fell down was the plank turning out of the socket in front, altogether. It felt like the plank was coming out of the groove. I didn't see the plank come out of the socket, I only saw it turn. I only saw it after it was out of the socket and after I was on the ground. All I remember is that while I was on the plank it fell down from behind and I fell to the ground with the ice and the plank."

Emely Cuny, the only other witness who testified in regard to the accident and the appliances for loading testified:

"I shot the ice down to him. A man named Freymouth assisted us in loading the ice that morning. Mr. Willie was on the wagon. When I let down the last bar of ice that morning I noticed that Mr. Willie was on the slide and when I looked out he was under the wagon and I noticed that he was hurt. The block of ice was under the wagon with him. I noticed the plank which conveyed the ice from the chute to the wagon and the end next to the wagon had slipped off, and that end was on the ground and the other rested against the end of the chute. I do not know how he was hurt. The wagon was loaded all except one bar. It is not necessary to get on that plank to load that bar of ice. The wagon should be driven about two and a half feet, sometimes three feet, from the chute in order to load it, just owing to the way a man drives up. It is dangerous to get the wagon too far from the end of the chute. If the wagon had been driven two or two and a half feet from the chute and the plank placed in the proper position, it would have been impossible for the plank to have fallen. It is not safe to get on the plank to load a piece of ice, especially when you put on thirty-five bars; when you put on thirty-five bars you pull your plank out of the slot and put it on top. The condition of the appliances and apparatus for shooting the ice into the wagon at the time of the injury was good. There was nothing broken or wrong with it in any way. Mr. Willie had loaded ice a long time before he was hurt, off and on a year before that time every day. He was never injured before, and used the same apparatus he was using that day."

This is substantially a statement of all the testimony upon the issues involved in the tenth assignment, and most of it comes from the plaintiff himself. The bare statement of it is in our opinion a complete answer to the charge of negligence against the defendant. Its duty was only to use ordinary care to furnish plaintiff with reasonably safe appliances or instrumentalities to do the work assigned him. The appliances complained of as defective had been used by plaintiff, and other servants doing the same kind of work, daily for a long time prior to his injury and during all that time no defect was ever discovered in them, nor did any accident occur to anyone in their use. This, in view of the facts that the instrumentalities were simple and open to the observation of those using them, is a complete negation of the failure of the defendant to discharge the duty imposed by law to exercise ordinary care to furnish its servants with reasonably safe appliances.

But the question need not be decided on this ground. Viewing the testimony of plaintiff in the light most favorable to him and indulging him in every reasonable inference that can possibly be deduced from it, not a fact or circumstance detailed by him, save the bare happen-

ing of the accident, tends in the least to show that there was any defect in apparatus by which the skid or plank was connected with the chute. And when his testimony is taken and considered in connection with that of Cuny, it is so proved there were none, "That the probation bears no hinge or loop to hang a doubt on." What caused the plank to fall is purely a matter of speculation. We may project the cantalever of conjecture as far as the testimony will sustain it over the chasm which separates the unknown from the known and it will not reach the domain of fact, nor cast a shadow of negligence towards the defendant.

This is not a case where the doctrine of *res ipsa loquitur* applies. For the plaintiff, having specifically alleged the acts of defendant's negligence, can not make out a *prima facie* case without direct proof of actionable negligence. But he must prove the acts of negligence which he averred, and that such negligence was the proximate cause of his injuries. Except in cases where the acts of the defendant speak negligence, it can not be inferred from the mere happening of the accident. As is said by this court in Galveston, H. & S. A. Ry. v. Garven, 109 S. W., 427: "There is really no exception to the rule that negligence is not inferable, as between master and servant, from the mere occurrence of the accident, but there are cases where the very nature of the accident may, of itself and through the presumption it carries, supply the requisite proof; that is, the circumstances in proof show that the accident would not have happened if due care had been exercised." See also Trinity Lumber Co. v. Denham, 85 Texas, 56; Broadway v. San Antonio Gas Co., 60 S. W., 270. The evidence in this case is not such as tends to show that the accident would not have happened if defendant had not been guilty of the acts, or some of them, of negligence charged. To give it such effect, would be to presume a fact which the evidence clearly shows did not exist.

Besides, the principle that it is the duty of the master to see to it that appliances or instrumentalities furnished for the use of his servant are reasonably safe, does not extend so far as to require him to attend to the regulation of those parts which necessarily have to be adjusted in the course of the use and with regard to the particular work to be done and the adjustment of which is incident to the ordinary use of the appliances. (Labatt's Master and Servant, sec. 613.) Applying this principle to the evidence in this case; it will be observed that it was incumbent upon plaintiff in the discharge of his duties of employment to place his wagon in proper position to be loaded, and then to properly adjust one end of the plank in the groove of the ice chute and place the other on his wagon; if he, in any respect, failed to discharge this duty, the liability for the consequences rested upon him and not upon his employer. In discharging these duties he must necessarily have known of the condition of the apparatus used for adjusting the plank in the end of the chute and where the wagon should be in order that the end of the plank from the chute might be safely placed upon it. The conditions, then, which may have caused his injury, were not such as ought to have been known by the defendant rather than by himself. He knew the condition of the groove under the chute, or must have known it from its daily use in the course of his employment. The adjustment of the plank to it and the placement of the wagon were

his own acts, and if his injuries resulted from these conditions, which is apparent from the evidence, the defendant can not be held responsible for them. For if the appliance for connecting the plank with the chute was defective as alleged, (of which there is not a particle of evidence) he must have known or be charged with knowledge of the fact, for "he could not shut his eyes to those things that would be obvious to a man who is ordinarily vigilant in protecting himself from injury." (St. Louis S. W. Ry. v. Hynson, 101 Texas, 543; Bonnet v. Galveston, H. & S. A. Ry., 89 Texas, 76; Kansas City So. Ry. v. Williams, 111 S. W., 198.) If he placed his wagon too far from the chute or did not properly adjust the plank, one or either of which is probable, and such act of his was the cause of his injuries, the responsibility rests upon him and not on the defendant.

But putting aside all matters of conjecture, there being no evidence whatever tending to show that defendant was guilty of any act of negligence causing plaintiff's injuries, the testimony did not raise the issue of the negligence alleged, and such issue should have been withdrawn from the jury and they should have been instructed, as requested by defendant, to return a verdict in its favor.

Because there is no evidence tending to support the verdict, the judgment of the District Court is reversed, and judgment is here rendered for appellant.

### ON MOTION FOR REHEARING.

In stating in the original opinion as the reason why the doctrine of *res ipsa loquitur* was inapplicable to the case, that "the plaintiff, having specifically alleged the acts of defendant's negligence, can not make out a *prima facie* case without *direct proof* of actual negligence," the words "direct proof" were not used, nor intended to be construed, in the sense of direct evidence as contradistinguished from indirect or circumstantial evidence. Proof is the effect of evidence, rather than the medium by which a fact is established. It was simply intended by the use of the words that the proof, whether by direct or circumstantial evidence, should be made of the specific allegations of negligence charged against the defendant; and that the principle of *res ipsa loquitur* could not be invoked as a substitute for such proof, because the mere happening of the accident did not speak with more directness of the negligence charged as its cause than it did towards its being the effect of some other cause.

The case being one where the rule of *res ipsa loquitur* does not obtain, it was incumbent upon the plaintiff, not only to prove that the defendant was guilty of negligence as alleged in his petition, but facts from which it could be fairly inferred that such negligence was the proximate cause of his injury. In reaching the conclusion expressed in our main opinion we considered no part of the testimony of the witness Cuny that conflicts or is inconsistent with that of the plaintiff. Because the plaintiff's testimony did not, in our opinion, tend to show that his injuries were proximately caused by any negligence charged in his petition, we examined Cuny's for the purpose of seeing whether it would throw any light upon the cause of the accident, and as it left us as much in the dark as to what caused it as we were before, we had nothing

from which the negligence of defendant could be inferred, except the happening of the accident itself. This was not enough to prove the specific act of negligence alleged, nor did it, in our opinion, tend any more in the direction of showing that such negligence was its cause, than it tended towards showing some other cause. True, every effect has its cause, and sometimes its antecedent can be deduced from the effect; but no such deduction can be made where the effect may be the product of one of several causes, none of which is shown to be more probable than the other.

In our judgment, such is the case before us. And as the burden was on the plaintiff to prove the cause of his injuries as he alleged it, his failure to produce evidence reasonably tending to show such cause, to the reasonable exclusion of others, entitled the defendant to a verdict. The motion is overruled.

*Reversed and rendered.*

Writ of error refused.

---

Cɪᴛʏ ᴏꜰ Sᴀɴ Aɴᴛᴏɴɪᴏ ᴇᴛ ᴀʟ. ᴠ. Aʟᴀᴍᴏ Nᴀᴛɪᴏɴᴀʟ Bᴀɴᴋ.

Decided December 9, 1908.

**1.—Appeal—Insufficient Assignments of Error.**

In an appeal from a judgment against a city for the sum of certain warrants held by the plaintiff, the following assignments of error are held too general to require consideration, viz.:

**2.—City Warrants—Judgment—Interest.**

When a judgment is rendered against a city for the sum of certain warrants issued by such city, the judgment should bear interest from the date of the same.

**3.—Same—Foreclosing Lien on Fund—Pleading.**

**4.—Pleading—Suit on City Warrant.**

In a suit against a city upon certain city warrants issued for the current expenses of a certain fiscal year plaintiff's pleading considered, and held, that an exception thereto on the ground that it appeared therefrom that there was a sufficient fund out of the uncollected back taxes for said fiscal year to more than satisfy plaintiff's warrants, and that said petition did not allege that defendant would divert said fund from the payment of plaintiff's warrants, was properly overruled.

Vol. LII. Civil—36.