## HARRIS v. MISSOURI–KANSAS–TEXAS R. CO. et al. (No. 11532.)

(Court of Civil Appeals of Texas. Fort Worth. March 13, 1926. Rehearing Denied April 10, 1926.)

**1. Evidence ⚖⟶54.**

Presumption cannot be built on presumption.

**2. Master and servant ⚖⟶265(1)—Presumption that inspector was under railway gravel car for purpose of repairing leaks when run over held not to arise.**

In absence of evidence that railway gravel car was leaking, and that deceased inspector discovered it, it cannot be presumed that he was under it, when run over, for purpose of inspecting it and repairing leaks.

**3. Trial ⚖⟶139(1) — Court must determine whether testimony raises more than mere surmise or suspicion of existence of fact, and, if not, instruct verdict.**

It is court's duty to determine whether testimony is of such probative force as to raise more than mere surmise or suspicion of facts sought to be established, and, if not, to instruct verdict, though there be slight testimony.

**4. Master and servant ⚖⟶286(32)—Evidence held insufficient to take to jury question of negligence of gravel contractor's servants in backing engine into cars on spur track, causing death of railroad employee under one of them.**

Evidence held insufficient to take to jury question of negligence of crew of engine, owned and operated by contractors furnishing railroad with gravel, in backing against string of gravel cars on spur track, thereby causing death of railroad employee under one of them.

**5. Master and servant ⚖⟶193(3)—Railroad is not constructively liable for injuries to employee by negligence of crew of engine owned by contractors furnishing gravel.**

Railroad company is not constructively liable for injuries to employee on spur track because of negligence of persons in charge of engine, owned and operated by contractors furnishing gravel to railroad.

**6. Negligence ⚖⟶121(2)—Res ipsa loquitur rule is inapplicable, where facts are equally consistent with injury by negligence of deceased or by defendant or both.**

Where facts shown are equally consistent with hypotheses that death was caused by negligence of deceased, defendant, or both, res ipsa loquitur rule does not apply.

**7. Master and servant ⚖⟶141—Railroad held not negligent in not prescribing rules for operation of engines handling gravel cars on spur track, where engineer knew duty to sound whistle.**

Railroad held not negligent in not prescribing and enforcing reasonable rules and regulations for operation of engines handling gravel cars on spur track with view to protecting employees required to work thereunder, where engineer knew it was his duty to sound whistle.

Appeal from District Court, Cooke County; C. R. Pearman, Judge.

Action by Eula Harris, administratrix of the estate of Jesse J. Harris, deceased, against the Missouri-Kansas-Texas Railroad Company and others. From a judgment for the named defendant, plaintiff appeals. Affirmed.

Randall & Randall, of Sherman, and W. O. Davis, of Gainesville, for appellant.

Garnett & Garnett, of Gainesville, for appellees.

BUCK, J. Mrs. Eula Harris, administratrix, sued the Missouri-Kansas-Texas Railroad Company of Texas, for damages for the death of her husband, Jesse J. Harris. Plaintiff alleged, and the evidence showed, that the railroad maintained, about 4 miles west of Gainesville, a spur track leading from its main line in a southwesterly direction towards a gravel pit operated by McDaniel Bros. The gravel pit was owned by a corporation in which the McDaniel Bros. were interested. The spur, shortly after leaving the

main line, parted 'at a switch and ran as two nearly parallel tracks for several hundred yards, and again met at a switch and continued as a single track for some distance, crossing a branch and connecting with a line running on down to the gravel pit. The track connecting the spur track and the gravel pit was owned by the McDaniel Bros., as partners. The railroad was procuring gravel from the McDaniel Bros. to ballast its own track. The cars in use were hopper bottom gravel cars, arranged so that the gravel in the car could be unloaded on the track by the use of a crank at the end of the car, the crank opening or closing the wings composing the bottom of the car, as desired. According to the usual way of transacting the business, the railroad would set the empty cars on the west spur track, and McDaniel Bros., with their own engine, manned by their own crew, would back up these empty cars from the spur track and carry them to the gravel pit, and load them with gravel. They would then place the loaded cars upon the east spur track, to be picked up by the railroad at its convenience, and carried to their place of destination.

Jesse J. Harris was in the employ of the railroad, and plaintiff alleged that it was his duty to look after these empty and loaded gravel cars and the business of the railroad in general at that point; that shortly before noon of July 3, 1923, while Harris was under one of a string of loaded gravel cars standing on the spur track, the engine of McDaniel Bros., pushing the string of recently loaded gravel cars, struck the string of loaded cars already on the track, and without warning, pushed the string of cars some 4 feet, causing the car under which Harris was to suddenly move, and the brake beam struck, crushed, and instantly killed him.

As grounds of negligence on the part of the railroad, plaintiff alleged that it was the duty of said Harris to inspect and put the cars in such shape that gravel would not leak therefrom, and that on the occasion in question, and in the discharge of his duties, said Harris was under one of said cars, engaged in inspecting and repairing same and in stopping a leakage therefrom; that a switch engine, without any notice to said Harris, and without any signals or warning being given, was violently backed against said standing cars and suddenly moved and pushed them for a distance of several feet, thereby causing the brake beam or axle or other portions of said car to strike said Harris with great force, thereby mangling and crushing him and causing his death; that the pushing of said recently loaded cars or the engine against said standing car under which said Harris was working, was gross negligence on the part of the persons in charge of said backing cars and the engine thereto attached, and persons in charge of said engine and backing cars, if not the agents and employees of the defendant, were operating said engine with the knowledge, consent, and at the request of the defendant, upon its switch track, and were engaged in defendant's business; and that the defendant was liable therefor as much and to the same extent as though its own agents and employees were engaged in said work. Plaintiff further alleged that the defendant was negligent in failing to prescribe and enforce reasonable rules and regulations governing the operation of engines handling gravel cars on its said switch track with the view of affording reasonable protection and security to said Harris and the other employees who were required to work on and about said switch tracks and under, about, and between the loaded gravel cars standing thereon.

The defendant railroad answered by a general demurrer and a general denial, and specifically denied that any of its servants were in any respect responsible for the death of said Harris, but that, upon the contrary, the cars and engine which were used to haul the loaded cars from the gravel pit, and to place them on the spur track, were operated and moved by independent contractors of the Gainesville Gravel Company, the corporation owning the said gravel pit, and that said independent contractors were not in the employ of or servants or agents of the defendant, and that defendant had no control over them as agents, servants, or employees, and that defendant was not liable for their actions in moving or operating said cars, or otherwise. Defendant further pleaded that no officer of the company was present at the time of the accident, but that the defendant was informed and believed and so alleged that, at the time of the happening of said unfortunate accident, said Harris was sitting under one of a number of cars loaded with gravel, or was asleep thereunder, and that the position of said Harris under said loaded gravel car hid and concealed him so that his presence thereunder was not and could not have been discovered by the exercise of ordinary care; that no agent, servants, or employee of the defendant participated in the movement of said cars, which resulted in the death of said Harris, and the defendant was not liable to the plaintiff for or on account of the death of said Harris; that the death of said Harris was caused and brought about by his own negligence, in that, at the time of said accident, he had no duty to perform in, about, or under said car, but had wrongfully and negligently gone under said car and sat himself thereunder so that he was concealed and could not be seen or his presence thereunder known by the exercise of ordinary care, and that this negligence on the part of the said Harris was the proximate cause of said accident and his death, without any negligence upon the part of defendant, its agents, servants, and employees.

The defendant railroad vouched in W. H.

and C. L. McDaniel, who as aforesaid, the evidence shows owned and operated the track connecting the spur track and the gravel pit and the engine used thereon. The McDaniel Bros. pleaded a general demurrer and general denial, and specifically pleaded that they had no control over the 2,970 feet of the switch track, and that they had no control over said Harris, the deceased, and were only authorized to take empty gravel cars from the spur track and into the pit, and to place loaded gravel cars on said spur track. They further alleged that, on the occasion in question, at about 11:45 a. m., they brought some cars of loaded gravel out of the pit, and placed them on the spur track, and coupled them to other cars already thereon; that the last car extended about 4 feet onto the switch track, and that, in order to take the empty cars from the empty track to the gravel pit, it was necessary to push the loaded cars a distance of about 4 feet; that, in placing the loaded cars on the loaded track and prior thereto, and in pushing the loaded cars the distance of 4 feet, and prior thereto, they sounded the whistle and blew some 15 or 20 blasts from the whistle of said engine; that at the time of the injury and death of said Harris he was under one of said standing gravel cars, and that these defendants and their operatives in charge of said engine and cars did not know at said time that he was anywhere near said cars, and had no reason to expect him to be there; that, under his employment and duties with said defendant railway company, Harris had no duty to perform under said cars; that at the time of his injury and death he was in such a position that the operatives in charge of said engine and cars could not see him and had no reason to expect him to be there. The McDaniel Bros. also pleaded that Harris was guilty of contributory negligence, which was the sole proximate cause of his death.

The cause was tried before a jury, and at the completion of the introduction of evidence, the court instructed a verdict for the defendant railway company, and, upon the verdict so rendered, judgment was rendered denying plaintiff a right to recover against the defendant railway company and that the defendant railway company take nothing as to the defendants W. H. and C. L. McDaniel. Plaintiff has appealed.

## Opinion.

The plaintiff, appellant here, urges that there was enough evidence tending to show the liability of the defendant railway company to make it a jury question, and that the court erred in instructing the jury to find a verdict for defendant railway company; that especially is this true inasmuch as under articles 6648 and 6649, Vernon's Sayles' Ann. Civ. St. 1914 (articles 6439 and 6440, Rev. St. 1925), contributory negligence, if evidence of its exists, does not amount to a complete de-

283 S.W.—57

fense, if evidence of negligence on the part of the railway is shown, but can only be considered in mitigation of damages. The plaintiff attempted to show, by her evidence, that it was a part of the duties performed by Harris to inspect the loaded cars, especially for leaks, and to attempt to stop the leaks, when it was found that gravel was escaping therefrom; that, there being no eyewitnesses to the transaction, the rule of "res ipsa loquitur" should obtain; that the transaction itself and the attendant circumstances are sufficient to justify a finding that Jesse J. Harris was under the loaded gravel car inspecting it or attempting to stop a leak at the time the car was violently moved without notice to him.

The right of trial by jury is preserved to us by our national and our state Constitutions, as is said by Chief Justice Conner in Hunt v. Garrett (Tex. Civ. App.) 275 S. W. 96, 105:

"One of the constitutional and legislative guaranties of right in a citizen of this country is the right of a trial by jury. We need not trace the history of the constitutional and legislative provisions relating to this subject, for it will not be denied that with the English speaking people the right of a trial by a jury of one's peers has long been vigorously asserted and jealously guarded and maintained by our courts. And, while it is undoubtedly within the power of courts to take a case away from a jury and require a finding in favor of one or the other of contesting litigants, the rule to be applied by the court in determining whether or not this may be correctly done was thus stated by our Supreme Court in the case of Lee v. International & G. N. Ry. Co., 89 Tex. 588, 36 S. W. 63, 65: 'To authorize the court to take the question from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.'"

Mrs. Harris testified: That she and her deceased husband and the baby lived in Gainesville at the time of his death. That he was working for the Missouri-Kansas-Texas Railroad Company out near the gravel pit. That he would carry his lunch with him from Gainesville in a lunch basket, and that he also had a gallon glass water jug. That she got the water jug and dinner pail he had with him at the time of his death, and the dinner bucket was just like it was when he left that morning, nothing had been taken from it, but she thought the water jug was empty when they brought it home.

S. W. Gibson, the undertaker, testified:

That he went out to the scene of the accident and saw the body under the car. That the left leg and arm had been cut off. That his body was pretty well under the brake rigging of the car. That in removing the body they worked the gravel away from him and dug it out with a shovel. That they had to do this before they could get it out. That there was a lot of loose gravel piled up so it had to

be shoveled out. That he did not know how high the gravel was, possibly two or three inches above the ties. Harris was wedged down in the gravel. That apparently he had been shoved up into the gravel as if he had been rolled. That there was loose gravel in front of him and beside him that had to be dug out with a shovel. That he thought in one place they dug down between the ties in order to get his body out, but otherwise the gravel was all on top of the ties; it was loose gravel. "He was under the south end of the car with the truck over him, brake rigging and things over him. The brake beam where it went over his body brushed the gravel down to the same height. There was no gravel around him. There was

On cross-examination, he testified:

"The gravel that I spoke of seeing there seemed to be gravel that extended along in the center of the track and between the rails, kind of lying along in the center of the track. I don't know where the gravel came from, near the body, but it was pretty stiff around him on both sides at the time we got him out."

The accompanying picture shows the place where the body was removed from under the car, the excavation that was made to do so, etc. The body of Harris was taken out where the open booklet or pamphlet is shown on the rail.

no gravel on top of him. He had a cut on the left side of his head about 4 or 5 inches long. The wound was on the left side of his head. There was a cottar key there that I ascribed the wound to. The cottar key is at the bottom of the brake rigging, through the center, one at each end. The brake beam is a rod that carries the brake shoes; it goes across the track from one side of the wheels to the other. The brake shoe is against the brake when the brakes are set. I would guess the brake beam was some 3 or 4 inches from the cross-ties. I judge a man's body is 8 or 10 inches thick. The center of the brake beam would probably be 3 or 4 inches above the rail. I don't think the south wheel of the rear truck had passed over his body at all. Only the front wheel of the rear truck upon the west side had passed onto his body. It appeared that the north wheel of the rear truck had severed the left arm and left leg, which were lying on the west side of the rail. * * *"

Clay Allen testified: That he knew Harris, and on July 3, 1923, he went fishing south of the gravel pit. That he saw Harris on that day before he was killed and afterward. That Harris was walking up the railroad track going north on the west side of the track the cars were on, between 11 and 12 o'clock, about 11:30. That after he and his friends reached the creek and had been there 10 or 15 minutes they heard and saw the movement of the loaded cars from the gravel pit towards the switch. That he could not see on which end of the cars the engine was, in fact he did not see the engine at all. That he did not see anybody on or about the cars. That he did not hear the whistle blow. That he would not say that the whistle did not blow and did not know whether the whistle blew or not, but he did not hear it. That

several hours after the supposed time of the accident he was where Harris' body was found. That he had seen a water bottle that morning near the track, and ahead of Harris, as he was going north. That when he got to the place of the accident he saw the water jug again and the dinner basket. That they were close together, about 6 or 8 feet from the rail. The jug was about the same place it was in the morning when he saw it.

M. O. Wilson testified: That when Harris lost his life, he (Wilson) was engaged in running a pump for McDaniel Bros. perhaps a mile and one-half south of where the accident occurred. That he went to the place where Harris was killed before his body was moved and saw the conditions of things there. He further testified:

"I remember seeing a dinner pail and a jug of water. I think some one examined the dinner and said it had not been eaten. The body was under the brake rigging of the car, between the two wheels on the inside of the rail. He was lying on the gravel and under the brake rigging. His body was lying between the track and headed east and north. There is a curve in the track. In one place, it runs north, and some place it runs northeast; the main line of the Missouri-Kansas-Texas runs east and west. The body was lying on a pile of gravel. There was gravel in between the rails. I should judge within a 2-foot radius around the body there might have been perhaps a yard of gravel. I hardly think there might have been as much as a yard and a half. I should judge something like a yard. I suppose a yard of gravel would weigh somewhere in the neighborhood of 3,000 pounds. I said there was a yard within a radius of 2 feet, but there was more gravel there. I could not say exactly whether that was fresh gravel or not. Some of the gravel gets hard when dry and some has more sand and does not get hard. The main bulk of that gravel gets hard. They used a pick and shovel in getting the gravel out. The body was lying on top of the gravel. I should judge there was from 6 to 8 inches of gravel in the middle of the track. Where there is a leak in a car, it falls in the middle of the track. The gravel I found there was the same kind that came out of the pit. I never tried to stop a leak in a gravel car from the bottom. The only way I ever tried to stop a leak was when I was loading the car and found it was leaking and stopped it from the top. We called these cars ballast cars. They have a lever on the ends to dump them, which spreads out the bottom and lets the gravel fall in the center of the track. They have to be wound up before loading. I don't know what Harris' duties were, whether he stopped leaks or not. I remember seeing a hoe there between the empty and load tracks. The grass looked like it had been cut, and the hoe was lying down apparently where the party had stopped cutting grass. I saw a water jug there, and there was a lunch basket there by the water jug. The bucket and jug were between the load track and empty track, but as to how far from the body I could not say. I believe I remember seeing a hat and gloves there; I believe they were in between the tracks. I understand there were

about 14 cars on the load track where Harris was killed. A gravel car, such as he was under, has two pairs of trucks, four wheels on the truck in front and four wheels on the south truck. Harris was under the south or rear truck of this car. One leg and one arm were lying on the outside of the west rail on the load track, and his body was in between the rails of the load track. Those cars were known as hopper bottom cars, and those hopper bottom cars were closed by turning a lever or crank at one or the other end of the car before they were loaded. I don't know how far the load and empty tracks were apart. As I remember, there was gravel all along this load track. The gravel might have been up as high as the rails and might not have been. But it seems to me there was gravel along there. It seems to me like there was gravel under this car where the body was found. As far as I remember, there was gravel at other places on that track. They had to get quite a bit of gravel from between the ties to get the body, and they made a pile of that gravel there where the body was taken out. To the best of my knowledge, they put that gravel on the outside of the track, on the west side of the track. They moved enough gravel to get Harris' body out. I would not judge there was over as much as a cubic yard of gravel because a yard is quite a bit of gravel. There was not near a yard of gravel taken out. Some of the gravel was left under there."

George T. Wilson testified that he had worked for the railroad off and on for some 20 years, and that he did the work that Harris was doing at the time of his death both before Harris went to work and after the death of Harris. He testified:

"The gravel cars are loaded at the gravel pit. The unloading is by means of a lever. By this means, the lower part of the gravel car is opened and the gravel is let down between the rails on the track. When going to load, the bottom is tightened the same way by a lever at the end of the car. They have to be cranked and tightened before the car is loaded. After a car is loaded full of gravel, pressing against the walls of the car, I don't think you could crank it and make it any tighter. There are several ways of stopping some of the leaks after the loaded gravel cars are placed upon the spur track and turned over to the railroad. You stop the leaks with grass by sticking it where the leaks are. I have used weeds and grass too, and have used some boards and some ties, a little of everything. I would put them in the place where the cars were leaking. I don't know about what causes those leaks. I did not employ Mr. Harris or give him any instructions as to his work. I told him to be careful about winding the cars; there was some danger in that. The cars were wound up after they came in there, before they went to the gravel pit. They did not come in there wound up. The cars were wound up before they were loaded. I wind the cars up. When empty cars come in there and are placed on the empty track, it is my duty to wind them up before they go down to the gravel pit to be loaded. Mr. Woods is the man who hired Harris. When cars come back from where they are loaded and are put on that load track,

I don't do anything with them. Sometimes, J stop leaks just as I told you a while ago. It is owing to what kind of a leak it is. Sometimes, I have to go under the car to do that if I can't fix it from the top. Sometimes some of the cars are leaking. I don't know the per cent. of them that are leaking. It is owing to the condition of the car whether these leaks are fixed or not. I have been trying to do the best I could towards stopping leaks. I don't know that I have to stop leaks every day. It is not infrequent. Sometimes I get under the car to do it, and sometimes, I get up in them. There is gravel between the ties of both tracks. I am frequently under those cars stopping leaks. I haven't any rules or regulations about how to do my work. I looked after those spur tracks out there for the Missouri-Kansas-Texas just before Jesse J. Harris did. I had not been out there but a little while when I was succeeded by Harris. Mr. Harris took the job I had, and, after he was killed, I took the job back. I tried to fix leaks in the cars if I could. I guess that was part of my duties. As to what kind of repairs I would do was owing to what had to be done. If a bolt had to be tightened or a chain, I had to get under the car to put a chain on. I stopped the leaks in the cars the best I could. In stopping those leaks, I had to get under those cars generally. If the chain was loose, I would naturally get under the car to fix it. I never saw any of these cars fixed so you couldn't unload them with a lever. When I was working out there the first time and the last time, I did not see any signals to protect me when I was doing work under those cars. I never saw any rules or regulations about that. I had to look out for myself was all I know. Mr. Woods employed me to work out there on those spur tracks near the gravel pit. Empty cars brought in there to be loaded with gravel were sometimes placed by the railroad on one of the spur tracks and sometimes on the other. On whichever track they were placed, I would wind the empty cars as they were brought in. Then they were taken by the McDaniels to the pit and loaded and brought back and placed on the track for the railroad company to pick up by a passing train and carried to their destination; that is the way it was done. The cars could not be wound up after they were loaded with gravel. I have pushed grass in under the bottom of the gravel car. I would use any kind of grass, dry grass or green grass, that I could get hold of, weeds or anything else, or hay. I did it of my own will and not because I received instructions to do it. The railroad company had no depot or platform or shop out there in the vicinity of or near those spur tracks. The spur tracks are in the open country. There are no trees closer than the creek. The railroad's spur track extends south across that creek on the bridge and stops on the other side of the bridge, and there McDaniel Bros.' track connects with it and extends on down to the gravel pit about a mile. When Harris was working out there, he had a shovel, pick, crowbar, jack, a hoe, a lining bar, wrench, and track chisel. It was his duty to do the section work on those spur tracks out there belonging to the railroad. The track wrench was used in tightening bolts about switches. He also had a monkey wrench. Mr. Harris had a track hammer. When I worked out there

before Mr. Harris did, I suppose I did the same duties as I am doing now."

J. R. Woods testified that he was a roadmaster of the defendant railway and resided at Denton; that he employed Harris. He testified:

"I employed Jesse J. Harris to do that work. I was Jesse J. Harris' superior, and he was working under me. I employed him here at Gainesville. We had no car inspector out there. He was the only man out at these tracks. I mean to testify that, if Mr. Harris went along by the side of a car out there and saw a leak that he could have stopped by putting in a board or a rock or grass or anything else, he must not do that because it was against his instructions; to have done that would have been contrary to the instructions I had given him, and would have been violating his duty. The load track out there was filled up with gravel to about the top of the rails. That would be a lot of unnecessary gravel. The reason they put gravel in there was because the gravel leaked from the cars, and they used it for ballast. The only ballast they had was leakage from the cars, which they disposed of by distributing it between the ties. Whenever it was dropped in a pile, it was the duty of the men to throw it outside. Whenever it got too high, we took out shovels and cut it down. That was part of his duty. There is gravel there thrown outside of the tracks. I couldn't say how long it had been since I had been down there at the time Mr. Harris got killed. If a nut was loose or a nail was sticking out in the way and he had a hammer, I suppose he would fix that. If he found a chain that wouldn't stay exactly right and would not bring the parts together, it would be proper for him to undo that and get the chain straightened out. If there was something-loose about the brake and he could probably fasten it, he did that. I don't consider those things repair work; we don't call little things like that repairs. I would not say that he would bad order a car; when you bad order a car, you have to chalk it. He didn't chalk any out there. He would tell Mr. McDaniel the car could not be loaded; it would be bad order, I suppose. The only thing Mr. Harris could bad order was the hopper. If he saw anything going wrong with the company's property, that he could reasonably correct, that didn't require any high education, it was his business to look after it, if he could do something to it. He would do 'that for the benefit of the company, when there was some little something to do, and if he found anything dangerous. I would not think it would be against his duty to do anything else out there but stop a leak. He could make an effort to stop a leak. I don't think it would be contrary to his duty to partly stop a leak if it could be done. I think it is something like 4,800 feet from the main line down to the end of the spur track that the railroad maintains. It is about 200 feet from the south switch down to the end of the track we maintain. It is down grade south on the spur tracks. You go down grade towards the creek."

Louis Crow, who was working for McDaniel Bros. as a switchman, testified, in brief: That on July 3, 1923, shortly before noon,

McDaniel Bros. pushed a string of recently loaded cars from the pit north and against the loaded cars already standing on the east track. That he was on the north one of these backing cars. That he knew of no rules or regulations with reference to signals. That there was not enough room on the load track south of the string of cars standing there for the nine recently loaded cars, and that they had to be pushed some distance north in order to clear the track so that the engine could go up on the west track and pick up the empties.

W. H. McDaniel, one of the partners, testified: That before the loaded cars were carried out, it was important for them to know whether there were any leaks losing the gravel. That they stopped all the leaks they could. That it was important for them that the leaks should be stopped before they reached the Missouri-Kansas-Texas track. That after they set out the loaded cars, they did not pay any more attention to them. That they would not be losing the gravel after they set the cars out, but the Missouri-Kansas-Texas would be losing it. That they were loading the Missouri-Kansas-Texas ballast, and that, after they delivered the loaded cars on the tracks on the railroad, they were not responsible for the leaks.

John Harris, a brother of the deceased, testified that he had had experience with hopper bottom gravel cars, loading and unloading them. He testified:

"If leaks in a loaded gravel car are not too large, they can be stopped. I have stopped leaks of that kind. I have stopped them several different ways. They can be stopped by putting weeds or grass in, or pieces of boards in there edgeways. That was my customary way of stopping them."

Evidence was introduced by the defendant railway company to the effect: That Harris, when he was employed by J. R. Woods, roadmaster of defendant railway, had been given instructions as to his duties, and was told to keep the empty cars wound up so as to prevent the gravel from leaking, and to keep the track clear of grass and weeds. That he was told that he must positively not make any repairs on the cars whatever, and that said Harris had nothing to do with the cars after they were loaded. That once when Woods was out at the spur track he noticed Harris trying to wind up the empty cars by using a gas pipe as a lever, and he told him that such practice was dangerous and not to use the pipe any more. Various witnesses testified that there was no evidence that the car under which the body of Harris was found was leaking at the time, or had been leaking, or that the car needed repairs. There was no evidence from any source that Harris was using any tools, or had any grass or boards under the car, at the time of the accident, for the purpose of stopping a leak. The position of the dinner bucket, some onions Harris had gathered from the garden of one of the McDaniel Bros., and of his gloves, tended to show that Harris had gotten under the car probably for the purpose of eating his dinner, or for the purpose of resting in the shade before eating his dinner. A hoe and some freshly cut Johnson grass was found near the car in question, indicating that shortly before the accident he had been cutting grass. There was further evidence: That it was impracticable, if not impossible, to stop leaks in the loaded cars by inserting grass, boards, or other matter in the leaks. That Harris had been told not to attempt to stop leaks in the loaded cars.

[1, 2] Defendant's evidence further was to the effect that no loose gravel was under the car in question at the time the body was found, just the gravel that had accumulated from leaks during the some 9 years since the pit had been opened. There is no evidence that Harris, or even George T. Wilson, was ever instructed by any one in authority with the defendant railway company, to perform any duty in or around the loaded cars, and the presumption, if such obtains, that such service was a part of the duty of Harris in his employment, is based principally on the testimony of George T. Wilson that he had attempted thus to stop the leaks, without any objections from his superiors, and upon the testimony of John Harris that, while working for another railroad he had been accustomed to try to stop the leaks in loaded cars.

To support the theory that at the time of the accident, Harris was under the car for the purpose of stopping leaks therefrom, we would have to indulge the presumption, first, that the car was leaking; second, that Harris discovered it; and, third, that Harris went under the car to stop the leaks. Some of us are of the opinion that this would be building a presumption upon a presumption, which is not allowable under well-established rules of evidence. Ft. Worth Belt R. Co. v. Jones, 106 Tex. 345, 166 S. W. 1130; G., C. & S. F. Ry. Co. v. Davis et ux. (Tex. Civ. App.) 161 S. W. 932; Ft. Worth & Rio Grande Ry. Co. v. McMurray (Tex. Civ. App.) 173 S. W. 929, writ of error denied; Medlin Milling Co. v. Mims (Tex. Civ. App.) 173 S. W. 968; St. L., S. F. & T. Ry. Co. v. West (Tex. Civ. App.) 174 S. W. 287, writ of error denied. If Harris was not under the car for the purpose of inspecting the same and repairing leaks or other defects, then there is no evidence that he met his death in the discharge of his duties, and that those in charge of the engine knew of his being under there at the time of the accident, or in the exercise of reasonable diligence should have known that he was under there.

[3, 4] It is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established —such testimony, in legal contemplation, falling short of being "any evidence"; and it is the duty of the court to determine whether the testimony has more than that degree of probative force. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Patterson v. Williams (Tex. Civ. App.) 225 S. W. 89; Hines, Director Gen., v. Walker (Tex. Civ. App.) 225 S. W. 837; Stone & Webster Eng. Corp. v. Brewer (Tex. Civ. App.) 161 S. W. 38; T. & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049. We think that the question of negligence should be disposed of under this rule.

[5] But, even if it be conceded that the evidence is sufficient to raise an issue as to the negligence of those in charge of the engine, owned and operated by the McDaniel Bros., it does not follow that the defendant railway company was liable. A railroad company is not constructively liable simply because the injuries to an employee occurred on the railroad's spur track. In G., C. & S. F. Ry. Co v. Gaskill, 103 Tex. 441, 129 S. W. 345, the Supreme Court said:

"But neither can we agree with the view of the trial court and the Court of Civil Appeals that, as matter of law and without regard to the question of fact just referred to, those operating the cars are to be regarded as having been servants or agents of the defendant. Even conceding for the purpose of the decision that the undertaking of the railroad company 'to transfer or move cars, loaded or empty, to or from said plant,' obligated it to move them from point to point on the spur after they had been put upon it as the convenience of the compress company in loading or unloading them might demand, it yet cannot be admitted that, if the latter company voluntarily undertook to do that work for itself with its own servants, it thereby made them the servants of the railroad company when neither company nor the servants themselves contemplated or consented to such a change of relation. Such a conclusion, in the language of the opinion in East Line & R. R. Ry. Co. v. Culberson, 72 Tex. 375 [10 S. W. 706, 3 L. R. A. 567, 13 Am. St. Rep. 805], would rest on 'a mere fiction not based upon any sound rule of law.' In that case a question much broader and more important than that before us was involved, viz. whether or not a railroad company which had leased its lines to another without authority of law was responsible for the negligence of the lessee, actually operating the road, causing injury to a servant of the latter, and, although the opinion fully recognized the principle that by such a lease the owner of a railroad could not escape any of its duties to third persons or to the public at large, and is to be treated, despite the unauthorized lease, as operating the road through the lessee and as responsible for such operation, yet it was held that the principle has no application as between the lessor and employees of the lessee whose rights as employees arise out of and are dependent on contract with the latter, and that the responsibility of the lessor does not include that for negligence consisting only in the manner of such operation. While there is a conflict of decision upon that question we are entirely satisfied with the soundness of the position of this court and believe it to be upheld by the weight of authority. Many of the decisions on the subject are cited in Elliott on Railroads, §§ 466, 472."

In Schaff et al. v. Ellison et al. (Tex. Civ. App.) 255 S. W. 680, writ of error denied, suit was filed by Mrs. Anna Belle Ellison against the receiver of the Missouri, Kansas & Texas Railway Company and the Summer-Sollitt Company, a private corporation, for the death of Mrs. Ellison's husband. The death of Ellison arose directly from the shunting of loaded cars onto a track or spur on which were standing several cars and a locomotive belonging to said receiver, and jamming a loaded coal car with such force as to crush and kill the deceased who was standing on the brake beam of the engine. The parties defendant sought to fix the negligence one upon the other, and each filed a cross-action praying for judgment over against the other. In affirming the judgment against the Summer-Sollitt Company and in reversing the judgment against the receiver and rendering judgment in his favor, the court said:

"The spur of the railroad was being used, not only by its owner, but by the construction company which leased the use of the same, and the rule is that, while a railroad company cannot, by lease or attempted sale, avoid its duties and responsibilities to the public, it would not be responsible for the negligence of the lessee to an employee of either the lessor or the lessee, unless the lessor's negligence concurred with the negligence of the lessee in bringing about the result. In other words, the liability of the lessor would not arise as to such employee by reason merely of ownership of the road, but upon the active participation of the lessor in the wrong perpetrated. Railroad v. Culberson, 72 Tex. 375, 10 S. W. 706, 3 L. R. A. 567, 13 Am. St. Rep. 805."

[6] It is urged by appellant that the rule of evidence known as "res ipsa loquitur" applies. In T. & P. Coal Co v. Kowsikowsiki, 103 Tex. 173, 125 S. W. 3, the court says:

"Again it is said that the defendant was in a position to clear away all these doubts. This consideration has force where a plaintiff has proved a state of facts which, while not free from question, is yet sufficient, in the absence of explanation, to give rise to an inference of negligence on the part of defendant. But it has no application where the facts shown are equally consistent, as they are in this case, with all these hypotheses, viz.: That the injury was caused (1) by the negligence of deceased, or (2) by that of defendant, or (3) by that of both deceased and defendant. 6 Thompson on Neg. § 7698, and cases cited. The defendant certainly

is not called upon to account for the conduct of the deceased."

See Lone Star Brewing Co. v. Willie (Tex. Civ. App.) 114 S. W. 186, writ of error denied.

[7] Appellant relies on the negligence of the defendant railway company in not prescribing and enforcing reasonable rules and regulations governing the operation of engines handling gravel cars on its said switch track with the view of affording reasonable protection and security to the defendant and its other employees who were required to work under and about and between the loaded gravel cars standing thereon. We do not see any rule or regulation whose observance would have insured to deceased a reasonably safe place to work which the employees of McDaniel Bros. did not know, and, according to their testimony, did not observe. The only ground of negligence alleged, which in so far as pertains to the employees of McDaniel Bros. in charge of the engine, is that they pushed the engine against the loaded cars without warning. The engineer and switchman in charge of the engine and the loaded cars testified that they did blow the whistle several times, sharp blasts, immediately before the engine was pushed against the standing loaded cars, which evidently caused the death of the deceased. It is true that Clay Allen, who was fishing at the creek near by at the time, testified that he did not hear the whistle, although he admitted that it might have sounded, and it might properly be urged that it became a question of fact as to whether or not the whistle was sounded immediately before the engine was rammed against the string of loaded cars. But the testimony of the engineer, E. L. McDaniel, was that he had been running an engine for some 9 years, and knew it was his duty as engineer, in approaching the crossings, coming out of the pit, and before the cars reached these crossings, to sound the whistle. We think it must be presumed, in view of his long service as an engineer, that he did know it was his duty to sound his whistle on approaching a crossing. There were two crossings between the pit and the spur track, and, if the whistle had been sounded at both of these crossings, or at either one of them, such warning of the approach of the engine, it appears, would have been sufficient to notify the deceased that an engine, or an engine and loaded cars, was approaching. We can see of no special protection to deceased, to have been afforded, if the railway company had prescribed and promulgated a rule that the whistle should be sounded upon the approach to a crossing, when the engineer in charge of the engine said he knew and evidently did know it was his duty to do so.

The untimely death of deceased arose by reason of a deplorable accident, and our sympathy goes out to the bereft widow and children, but we conclude that we cannot disturb the action of the trial court in instructing the jury to render a verdict for the defendant railway company, and the judgment is therefore affirmed.